*Frederick Classical Charter School, Inc. v. Frederick County Board of Education*, No. 25, September Term, 2016.  Opinion by Getty, J.

**EDUCATION LAW — STANDARD OF REVIEW APPLIED BY THE STATE BOARD OF EDUCATION TO DECISIONS OF A LOCAL SCHOOL BOARD**

State Board of Education was required to apply an "independent judgment" standard of review to a decision of a local school board that transportation funding should not be included in a per-pupil commensurate funding allocation to a public charter school when the local school board decision involved only the "explanation and interpretation of the public school laws and State Board regulations" and not a local policy or a local dispute.

**EDUCATION LAW — STATUTORY CONSTRUCTION — MARYLAND CODE, EDUCATION ARTICLE § 9-109 — CHARTER SCHOOL FUNDING**

State Board of Education erred in ruling that a public charter school was not entitled to transportation funding in a per-pupil commensurate funding allocation.  Although the controlling statute for public charter school funding, Maryland Code, Education Article § 9-109, was ambiguous, and the legislature had intended for the State Board to interpret the statute, the State Board's conclusion was contrary both to its own precedent, on which it expressly relied in reaching its conclusion, as well as the statutory purpose and legislative history of the Maryland Public Charter School Program statute, Maryland Code, Education Article §§ 9-101 *et seq.*

**EDUCATION LAW — STATUTORY CONSTRUCTION — MARYLAND CODE, EDUCATION ARTICLE § 9-109 — CHARTER SCHOOL FUNDING**

State Board of Education is not required to adhere to its previous interpretation of Maryland Code, Education Article § 9-109 expressed in its prior adjudicatory rulings resolving funding disputes between charter schools and local school boards, as clarified by the Court of Appeals in the instant case and in *Baltimore City Board of School Commissioners v. City Neighbors Charter School*, 400 Md. 324 (2007).  The State Board may change its interpretation either in an adjudicatory proceeding or through formal notice-and-comment rulemaking.

However, because the State Board's statements in its prior adjudicatory rulings interpreting Maryland Code, Education Article § 9-109 are the only publicly available interpretation of the statute, and charter school operators and staff, children attending charter schools and their parents, and local school boards all have substantial reliance interests in the existing State Board interpretation, if the State Board elects to apply a new interpretation of the statute through an adjudicatory approach, it must offer a rational explanation for such a change in its written decision.  That rational explanation must include how its new interpretation or approach is in keeping with the plain language and, where ambiguous, the

legislative history and statutory purpose of Maryland Code, Education Article § 9-109 and the Maryland Public Charter Schools Program statute as a whole, Maryland Code, Education Article §§ 9-101 *et seq.*, and account for the substantial reliance interests of charter school operators, staff and students, prospective charter school applicants, and local school boards.

**CONTRACTS — CONTRACT INTERPRETATION**

Charter agreement contract between charter school and local school board plainly did not include an agreement that charter school would forego or waive transportation funding. Consequently, State Board of Education erred in concluding that charter school was not entitled to the inclusion of transportation funds in its per-pupil commensurate funding allocation based upon the charter agreement.

Circuit Court for Frederick County
Case No. 10-C-14-001818
Argued: November 3, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 25

September Term, 2016

FREDERICK CLASSICAL CHARTER
SCHOOL, INC.

v.

FREDERICK COUNTY BOARD OF
EDUCATION

Barbera, C.J.
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

Opinion by Getty, J.
Watts and Hotten, JJ., dissent.

Filed: July 14, 2017

How many times have you heard someone say
"If I had his money, I could do things my way?"
But little they know that it's so hard to find
One rich man in ten with a satisfied mind

Porter Wagoner, *Satisfied Mind* (RCA Records 1955).

When the Maryland General Assembly passed a state enabling statute in 2003 to create a charter school program, it expressed its intent for the program in the statutory findings that charter schools "provide innovative learning opportunities and creative educational approaches to improve the education of students." 2003 Md. Laws, ch. 358. See also Md. Code, Educ. ("ED") 9-101. However, the enabling statute created a statutory scheme under which such schools would be "public" schools overseen by the school board of the local jurisdiction. *See* ED § 9-102. Moreover, the General Assembly did not create a separate funding stream for these public charter schools but instead provided that charter funding would come from other people's money, *i.e.*, the local school board's budget. *See* ED § 9-109. The autonomy of a public charter school is further limited by the statute's other provisions that give local school boards the "chartering authority" to approve applications to form a public charter school, and by a requirement that, for those counties that have entered into a collective bargaining agreement with a teacher's union, only members of the union that is a party to that agreement can be assigned as staff for a public charter school. *See* ED §§ 9-103; 9-104; 9-108(b).

Under this statutory organization, there is a natural and inherent conflict with the local school board's role in supervising charter schools and approving charter school applications and its own self-interest; to the extent that the local school board authorizes

the creation or expansion of a charter school, there is a concomitant reduction in funds available for the education of the non-charter students in the local public system. This tension in the funding stream for public charter schools has left dissatisfied minds on both sides and has led to appeals from local school board funding decisions that have come before Maryland's appellate courts. *See, e.g., Balt. City Bd. of Sch. Comm'rs v. City Neighbors Charter Sch.*, 400 Md. 324 (2007); *Frederick Classical Charter Sch., Inc. v. Frederick Cty. Bd. of Educ.*, 227 Md. App. 439 (2016); *Monarch Acad. Balt. Campus, Inc. v. Balt. City Bd. of Sch. Comm'rs*, 231 Md. App. 594, *cert. granted sub nom., Monarch Acad. Balt. Campus v. Balt. City Bd. of Sch. Comm'rs*, 452 Md. 523 (2017).

This case involves a dispute between Frederick Classical Charter School, Inc. ("Frederick Classical"), the Petitioner, a charter school located in Frederick, Maryland and the Frederick County Board of Education ("the Local Board"), the Respondent. The parties' dispute focuses on whether the Local Board's annual funding allocation to Frederick Classical in its first year of operation satisfied ED § 9-109. Under that statute, a local school board is required to disburse to a public charter school "an amount of county, State, and federal money for elementary, middle, and secondary students that is commensurate with the amount disbursed to other public schools in the local jurisdiction." ED § 9-109.

In this case, Frederick Classical was not satisfied with its annual commensurate funding allocation as determined by the Local Board because it did not include a proportional share of funds which the Local Board had budgeted for student transportation. The funds withheld amounted to $544.26 per-pupil and $135,926.22 in the first year of the

school's operation, and more in subsequent years. Frederick Classical challenged the allocation, first in a letter to the Local Board and, when the Local Board summarily refused to amend the allocation, in an appeal to the State Board.

In reviewing Frederick Classical's appeal, the State Board regarded the issue as one of local policy, and thus applied a deferential standard of review, in which it assumed that the Local Board's decision to withhold transportation funds was "*prima facie* correct" unless proven to be "arbitrary, unreasonable, or illegal." *See* Md. Code Regs. ("COMAR") 13A.01.05.05(A)-(C). On the merits, the State Board determined that "it does not appear that [Frederick Classical] provides any transportation services" to its students. The State Board concluded that, under ED § 9-109 and its own precedent, "a charter school is not automatically entitled to funds for services it does not provide," and that "if [Frederick Classical] received funds for services it did not provide, it would be receiving more than its commensurate share of [ ] funds."

The State Board also focused on language in the charter agreement between Frederick Classical and the Local Board, which stated that transportation of students "shall be the responsibility of [Frederick Classical] families," with certain narrowly defined exceptions. The State Board interpreted that provision to mean that Frederick Classical had "agreed it is not entitled to [transportation] funds by virtue of having parents take on the responsibility for transportation." For those reasons, the State Board upheld the Local Board's decision to withhold transportation funding from Frederick Classical's annual funding allocation.

Frederick Classical petitioned for judicial review of the State Board's declaratory ruling before the Circuit Court for Frederick County, which upheld the State Board's ruling. Then, Frederick Classical appealed to the Court of Special Appeals which, in a reported opinion, likewise affirmed the State Board's decision. *Frederick Classical Charter Sch., Inc. v. Frederick Cty. Bd. of Educ.*, 227 Md. App. 439 (2016). Frederick Classical thereafter petitioned this Court for a writ of certiorari, which we granted on July 11, 2016. 448 Md. 724 (2016).

We hold that the State Board erred by applying the deferential standard of review for decisions of a local school board on a matter involving a local policy or a local dispute, as defined in COMAR 13A.01.05.05(A)-(C), instead of the "independent judgment" standard for the "explanation and interpretation of the public school laws and State Board regulations" defined in COMAR 13A.01.05.05(E). We further hold that the State Board's conclusion that Frederick Classical was not entitled to transportation funds when it did not provide transportation services is contrary to its own precedent as well as the statutory purpose and legislative history of the statute. Hence, the State Board's decision to deny transportation funds to Frederick Classical on that basis was arbitrary and capricious and an abuse of discretion. And, we hold that the State Board erroneously determined that Frederick Classical agreed, in its charter agreement, that it was not entitled to transportation funds. Therefore, we shall reverse the judgment of the Court of Special Appeals, and remand the case to the intermediate appellate court with instructions to remand to the circuit court, and with further instructions for the circuit court to remand the case to the State Board, for further proceedings before the State Board consistent with this opinion.

4

# I.
# BACKGROUND

## A. *Charter Schools and Commensurate Funding*

### *Charter Schools*

Charter schools are a statutorily created alternative to traditional public schools that are "in the nature of semi-autonomous public schools," operating "under a contract with a State or local school board." *Balt. City Bd. of Sch. Comm'rs v. City Neighbors Charter Sch.*, 400 Md. 324, 328 (2007). "The contract, or charter [agreement], defines how the school will be structured, staffed, managed, and funded, what programs will be offered, and how the school will operate and account for its activities." *Id.* The first charter school law was passed in Minnesota in 1991, and currently forty-two states and the District of Columbia have public charter school laws, with more than 6900 charter schools currently in operation, enrolling an estimated 3.1 million students.[1]

### *Maryland's Charter School Statute*

The legislative struggle to establish a publicly funded charter school program in Maryland was a long and arduous one, lasting over six years. *City Neighbors*, 400 Md. at 348-54. Ultimately, in 2003, the Maryland General Assembly passed the Maryland Public

---

[1] National Alliance for Public Charter Schools, The Health of the Charter Public School Movement: A State-by-State Analysis (Mar. 2016), http://www.publiccharters.org/wp-content/uploads/2016/03/Health-of-the-Movement_2016.pdf?x87663 [https://perma.cc/8CCL-63F5]; National Alliance for Public Charter Schools, Estimated Charter Public School Enrollment, 2016-17 (Feb. 2017), http://www.publiccharters.org/wp-content/uploads/2017/01/EER_Report_V5.pdf [https://perma.cc/9TAY-B6RK].

Charter School Program ("Charter School Program"). *See* ED §§ 9-101 *et seq.*; *see generally City Neighbors*, 400 Md. 329-31 (summarizing the provisions of the Charter School Program). The General Assembly subsequently significantly revised the Charter Schools Program in 2015, with the passage of the Public Charter School Improvement Act. 2015 Md. Laws, ch. 311. More than a decade after the enactment of the program, there are an estimated forty-nine public charter schools in Maryland, with 19,370 students enrolled in those schools.[2]

The Charter School Program statute sets forth a process for establishing new charter schools as well as monitoring, oversight, and accountability standards for charter schools once they are established. Section 9-101(b) states that the purpose of the Charter School Program is to "establish an alternative means within the existing public school system in order to provide innovative learning opportunities and creative educational approaches to improve the education of students." Section 9-102 defines a public charter school as one that meets the thirteen conditions set forth in the section, including that a charter school must operate "in accordance with its charter."

The public chartering authority, or the charter school authorizer, is "the county board of education." ED § 9-103. Thus, charter school advocates must submit applications to establish a new charter school to the local school board. For a new charter school, that

---

[2] National Alliance for Public Charter Schools, The Health of the Charter Public School Movement: A State-by-State Analysis 80, (Mar. 2016), http://www.publiccharters.org/wp-content/uploads/2016/03/Health-of-the-Movement_2016.pdf?x87663 [https://perma.cc/8CCL-63F5]

application must be in compliance with the requirements of § 9-104, whereas existing charter schools may seek to renew their charter school agreements under a process set out in § 9-104.1.

At issue in this appeal is § 9-109, which provides a mandate for public funding of public charter schools:

> A county board shall disburse to a public charter school an amount of county, State, and federal money for elementary, middle, and secondary students that is commensurate with the amount disbursed to other public schools in the local jurisdiction.

The statutory interpretation of this provision and deciphering the meaning of "commensurate" in this context has required extensive administrative deliberations and left most parties dissatisfied.

*City Neighbors Charter School*

The first case in which this Court addressed a dispute between a charter school and a local school board over the meaning of the funding provision of ED § 9-109 was *Baltimore City Board of School Commissioners v. City Neighbors Charter School*, 400 Md. 324 (2007). Judge Alan M. Wilner, writing for the majority, provided an extensive analysis of the General Assembly's passage of the Charter Schools Program and, in particular, the legislative history of the "commensurate" funding provision in ED § 9-109.

At issue in *City Neighbors* were three cases before the State Board—two appeals from local board actions, and one request for a declaratory ruling—all stemming from charter school disputes with local county boards of education over the allocation of "commensurate" funds pursuant to ED § 9-109. *Id.* at 334. The disputed local school

7

board actions included "excluding certain categories of its system-wide spending when calculating the charter school allocation," and "requiring the charter schools to accept other categories of [funds] in the form of services rather than cash." *Id.* at 332.

The State Board proceeded to issue three declaratory rulings based on those cases, in which it "addressed three basic subjects—the standard of review to be applied by [the State Board], the application process,[3] and the proper interpretation of ED § 9-109(a)."[4] *Id.* at 335. "The three opinions obviously attracted considerable comment, some of it critical, in the news media and among the educational establishment," which prompted the State Board to hold an open meeting and thereafter issue revised opinions in each of the three cases on May 26, 2005 (hereinafter, "the *City Neighbors* declaratory rulings"). *Id.* "Those opinions, which were both clarifying and substantive in nature, constitute[d] the final decisions of the [State] Board." *Id.*

As to the appropriate standard of review in cases involving funding disputes for a charter school under ED § 9-109, the State Board determined that, under ED § 2-205(e), "it was empowered to 'explain the true intent and meaning' of the provisions of the Education Article that were under its jurisdiction and to decide 'all controversies and

---

[3] The State Board's rulings as to the application process are not relevant to the parties' dispute in the instant action, and therefore are not further discussed.

[4] A prior version of ED 9-109 contained two subsections, (a) and (b). Subsection (a) is identical to the current text of the statute. Subsection (b) authorized local school boards or the State Board to donate "surplus educational materials, supplies, furniture, and other equipment" to charter schools. In the 2015 amendments to the Charter Schools Program, subsection (b) was deleted, but subsection (a) was not changed. See 2015 Md. Laws, ch. 311.

disputes under [those] provisions.'" *Id.* Furthermore, the State Board determined that "COMAR 13A.01.05.05[(E)] directed that the [State] Board 'exercise its independent judgment on the record before it in the explanation and interpretation of the public school laws and State Board regulations.'" *Id.*

The "main issue" in the *City Neighbors* declaratory rulings was "funding and the meaning of ED § 9-109(a), in particular the phrase 'commensurate with the amount disbursed to other schools in the local jurisdiction.'" *Id.* at 336. The State Board concluded that ED § 9-109(a) "expressed a legislative intent that a charter school 'receive federal, State, and local funding in an amount proportionate to the amount of funds expended for elementary, middle, and secondary level students in the other public schools in the same system.'" *Id.* Furthermore, the State Board determined that the calculation of commensurate funds must include "'funding for services for which students in the public charter schools are eligible such as free and reduced price meals, pre-kindergarten, special education, English-language learners, Perkins, Title I, **and transportation**.'"[5] *Id.* (emphasis added). The Board further specified that the commensurate funding was to be calculated by starting with the local school system's total annual operating budget that includes all federal, State, and local funding,[6] and dividing by enrollment for the previous

---

[5] "Perkins" refers to the Federal Carl D. Perkins Vocational Education Act. *See* 20 U.S.C. §§ 2301 *et seq.* "Title I" refers to Title I of the Federal Elementary and Secondary Education Act of 1965, as amended from time to time. *See* 20 U.S.C. §§ 6301 *et seq.*

[6] The State Board noted that for the purposes of this calculation, "the total annual school system operating budget amount shall exclude appropriations for debt service and

9

year[7] to reach an average per-pupil figure, overall and for each major category of spending. *Id.* at 336-37. Then, after deducting two percent for central office administrative costs, the State Board directed that local boards multiply the average per-pupil figure "by the student enrollment of the charter school to determine the total funding amount for the charter school." *Id.* at 337.

The State Board determined that "[b]ecause the total school system operating budget encompassed all funds," including funds for specific services, "the average per[-]pupil amount derived from [the total operating budget] figure would be sufficient for the charter school to deliver the services for which its students were eligible." *Id.* The State Board noted, however, that charter schools "would have to make budgetary allocations in light of the students' eligibility requirements" under federal or state law "and in doing so must comply with all applicable Federal and State requirements." *Id.* "For the special services that must be provided to eligible students," the State Board determined that "[a] charter school could elect either to provide the services directly or have them provided by the school system, but if it opted for the latter, it would be required to reimburse the school

_____

for adult education[.]" *City Neighbors Charter School v. Balt. City Bd. of Sch. Comm'rs*, MSBE Op. No. 05-17 (May 26, 2005), at 4 n.2.

[7] The State Board explained that in calculating the per-pupil allocation, school systems "shall use the approved school system annual operating budget for the year in which the charter school application is filed." *City Neighbors Charter Sch. v. Balt. City Bd. of Sch. Comm'rs*, MSBE Op. No. 05-17 (May 26, 2005), at 4 n.3. However, because the enrollment count for each school year is not finalized until November, "the school system enrollment count for the previous school year shall be used for the calculation." *Id.*

system for the proportionate cost of those services." *Id.* at 337-38. A charter school would also need to reimburse the local school board "'for salary, local retirement, and other fringe benefit costs for the public school employees working in the charter school as well as for regular services and supplies that the charter school requests the local school system to provide.'" *Id.* at 338.

"As 'further guidance' on the implementation of that funding methodology, [the State Board] adopted and incorporated by reference 'guidance documents' . . . that had been discussed at the Board's open meeting[.]" *Id.* at 338. One of those documents, Exhibit 2, "Use of Average Per Pupil Funding and Central Support," noted that "[t]he calculation of average of cost does not mean that the funding mix of each fund source" in a local county board's budget "must be duplicated at the [c]harter [s]chool level," and that "[t]here is reason neither to assume nor expect that [a local county board] would create a mirror image of itself within the [c]harter [s]chool." *City Neighbors Charter Sch. v. Balt. City Bd. of Sch. Comm'rs*, MSBE Op. No. 05-17 (May 26, 2005). That document also stated that "[t]he actual funding sources that would be provided to [a charter] school would be dependent on the specific school's eligibility for those restricted funds." *Id.* Another document, Exhibit 4, "Charter Schools and Special Education," stated the following regarding transportation:

> As a part of the contract agreement between the [local school system] and Charter School, transportation should be addressed for all students including students with disabilities attending the charter schools. This may include the Charter School returning to the [local school system] the portion of funds provided for transportation or the Charter School providing the transportation service for the student. . . .

11

*Id.*

Notably, the State Board also stated that "its opinions should be used as 'guidance and direction' to [ ] other charter school applicants and local school systems 'for the refinement of their working relationships on behalf of the public school children throughout this State.'" *City Neighbors*, 400 Md. at 339.

This Court began our analysis in *City Neighbors* by considering whether the State Board's rulings amounted to a "regulation" as defined in the State Administrative Procedure Act, codified in Maryland Code, State Government Article § 10-101 *et seq*., and were thus invalid because they were not issued in conformance with the requirements of that statute for formal rulemaking through regulations. *Id.* at 344. We noted that "administrative agencies have discretion to establish policy either through the adoption of regulations or through *ad hoc* contested case adjudications and that it would [be] patently unreasonable to conclude that every time an agency explains the standards through which it applies a statute in a contested proceeding it is promulgating rules." *Id.* at 345 (citations and internal quotation marks omitted). We therefore concluded that the State Board "was well within its discretion to proceed in the manner it did—adjudicating the cases before it and offering 'guidance' to other applicants, rather than proceeding with more formal and binding regulations." *Id.* at 346.

Turning to the principal question of whether the State Board "had properly construed and applied ED § 9-109," we discussed the text of the statute, concluding that it was "patently ambiguous," explaining that,

[Local] school boards do not disburse funds to the other public schools in the local jurisdiction. The school boards do not send checks, wire funds, or deliver wads of cash to the principals for the payment of teachers' salaries or the salaries of anyone else, or for the purchase of textbooks, other instructional materials, or incidental supplies and equipment, or for the maintenance of their respective facilities, or to provide transportation, lunch, or health or guidance services for the students. The phrase "disbursed to other public schools in the local jurisdiction" [in the statute] therefore cannot be read literally. No one can calculate a precise dollar amount disbursed to the X Middle School in order to determine a "commensurate" amount that should be disbursed to the Y Public Charter Middle School, because there is no such disbursement. The whole comparative framework, therefore—what the disbursement to the public charter schools should be commensurate with—requires interpretation. It is not even close to being clear on its face.

*Id.* at 346-47. We therefore discussed in detail the legislative history of the "commensurate" funding requirement in § 9-109(a). *Id.* at 348-54. We concluded from our review of the legislative history that the General Assembly had clearly intended "that the determination of commensurate funding would necessarily be on a per[-]pupil basis." *Id.* at 355. However, we also concluded that the General Assembly had also "left some room for interpretation" as to "what was commensurate and how [ ] the amount disbursed to other public schools [was] to be determined[.]" *Id.* Furthermore, we concluded that the General Assembly "must have envisioned" that the primary authority to interpret that provision would rest in the State Board, "the body [the General Assembly] has consistently vested with the ultimate administrative authority to interpret, explain, and apply the public education laws." *Id.*

We determined that the State Board's interpretation of ED § 9-109 and the "commensurate" funding requirement was well within its discretion. We found "no legal error in the [State] Board's use of the average per[-]pupil funding approach." *Id.* at 356.

13

And, we determined that the State Board did not err in interpreting the provision to require local school boards to disburse money, as opposed to services, unless a charter school elects to "negotiate for the provision of services, if they would rather have the services, for which [it] would be required to reimburse the county board[ ]." *Id.* We concluded that under the statute, services "cannot be forced on the charter schools at the whim of the county boards." *Id.* Furthermore, we held that the State Board was "clearly entitled" to conclude that "commensurate" funding to charter schools must include funding for Title I and special education funds "to the extent that students in the charter school are eligible for those services." *Id.*

*Monocacy Montessori Communities, Inc.*

In *Monocacy Montessori Communities, Inc. v. Frederick County Board of Education*, MSBE Op. No. 06-17 (May 24, 2006) (hereinafter, "*Monocacy*"), the State Board decided an appeal by a public charter school, Monocacy Montesori Communities, Inc. ("MMCI") from a "commensurate funding" decision of the Frederick County Board of Education that, according to MMCI, deprived it of funding to which it was entitled by statute. *Monocacy* is thus very similar to Frederick Classical's appeal to the State Board from a "commensurate funding" decision of the same local school board.

In *Monocacy*, the State Board noted that the Local Board used a formula in calculating MMCI's per-pupil allocation that differed from the one the State Board had endorsed in the *City Neighbors* declaratory rulings. *Id.* at 3. The State Board described the formula used by the Local Board as follows:

14

The formula used by the local board had three steps. First, it subtracted from the total budget all restricted budget amounts targeted for specific programs and services. That resulted in the "unrestricted budget." Second, it adjusted the total unrestricted budget proportionally [by] subtracting the value of the services it provided in-kind and directly to MMCI. It divided that amount by the number of students enrolled. . . . Finally, the local board would add on to that per[-]pupil amount any restricted funds for which [the] charter school or its students were eligible.

*Id.* The State Board determined that the Local Board's formula was "not consistent with the State Board's formula" set forth in the *City Neighbors* declaratory rulings. *Id.* at 4. Nonetheless, the State Board did not deem that an error of law, stating that it had not intended to require that the formula for per-pupil funding stated in the *City Neighbors* declaratory rulings must be used "without deviation[ ] by every local school system in calculating a charter school's funding allocation, no matter what the circumstances." *Id.* at 5.

However, the State Board did not stray far from the formula put forth in the *City Neighbors* declaratory rulings. It stated that the *City Neighbors* formula "results in a bottom line amount of money that this Board considers proportionate/commensurate funding." *Id.* Although a local school board may apply a different formula, "that formula must result" in the same "bottom line amount of money" so that the State Board could "conclude that the school system was providing proportionate/commensurate funds to the charter school." *Id.*

Applying that standard, the State Board determined that, after taking into account the value of the in-kind services that the Local Board was providing to MMCI, the per-pupil allocation figure reached under the Local Board's formula was $932 lower than that

under the State Board's formula. *Id.* at 8. However, one of the main reasons for that difference was that "[the Local Board] put no money into the charter school budget for transportation." *Id.*

The State Board determined that the withholding of transportation funding was justified by the charter agreement between MMCI and the Local Board. That agreement was entered into on January 14, 2005—after the General Assembly had enacted the Charter Schools Program statute and ED § 9-109, but before the State Board had clarified the meaning of "commensurate" funding in the *City Neighbors* declaratory rulings. *Id.* The MMCI charter agreement contained a provision stating that "transportation shall be the responsibility of MMCI except for students who live along [an] established [bus] route and for special education students." *Id.* The State Board interpreted that language to mean that that "MMCI essentially has agreed that it is not entitled to the transportation dollars contained in [the Local Board's] Total Operating Budget," and consequently, that "the cost of transportation services per[-]pupil should be deducted" from MMCI's per-pupil allocation. *Id.* at 9. The State Board therefore reduced its "bottom line" per-pupil figure by $420 "to reflect the transportation agreement." *Id.* at 10.

With little discussion, the State Board also made a final adjustment to its "bottom line" per-pupil amount, by following the lead of the Local Board and subtracting all restricted budget amounts targeted to specific programs and services from the total operating budget figure. *Id.* at 11. Consequently, the State Board further reduced its "bottom line" per-pupil figure by an additional $500. *Id.* After making the adjustments for transportation funding and restricted funds, the difference between the State Board and

16

the Local Board's figures was $12.  *Id.*  The State Board therefore found that "to provide commensurate funding . . . [the Local Board] must provide an additional $12 per[-]pupil to MMCI."  *Id.* at 12.  And, although it had approved removing restricted funds from the per-pupil allocation formula, it also found that the Local Board must also add to the per-pupil amount "any restricted funds to which MMCI is entitled."  *Id.*

## B.  Current Proceedings

*Frederick Classical Charter School*

Frederick Classical is an educational nonprofit corporation created to establish, organize, and operate a charter school.  On April 6, 2011, the Local Board approved Frederick Classical's application to form and operate a charter school with amendments and conditions.  On February 3, 2012, Frederick Classical and the Local Board executed a charter agreement, which commenced on July 1, 2013.  The charter agreement authorizes Frederick Classical to operate a charter school for four school years, from July 1, 2013 until June 30, 2017, but permits Frederick Classical to request an extension of the term of the agreement at any time.  Prior to the expiration of the term of the charter agreement on June 30, 2017, Frederick Classical may also request a renewal of the agreement.

The charter agreement outlines the relationship, rights, and obligations between Frederick Classical and the Local Board.  The pertinent provisions relevant for this appeal are the funding and transportation provisions.  The funding provision of the agreement states, in pertinent part

> In accordance with ED § 9-109 and further clarified in corresponding State
> Board rulings, the [Local] Board shall disburse to [Frederick Classical] an
> amount of county, state, and federal money for elementary, middle, and

17

secondary students that is commensurate with the amount disbursed to other public schools in the local jurisdiction. [Frederick Classical] may seek and receive other funds through local, state or federal government sources and/or from private sources without a reduction in its annual commensurate allocation.

The student transportation provision states:

Transportation shall be the responsibility of [Frederick Classical] families with the following exceptions:

1. Students who live along an established bus route that passes the School facility; and
2. Special education students with transportation on their [Individualized Education Plans].

If [Frederick Classical] subsequently determines to provide transportation during the term of this Charter, it may contract with an approved provider for transportation services within provisions allowable under the negotiated agreement.

*Frederick Classical 2014 Fiscal Year Funding Allocation*

On June 26, 2013, Leslie Pellegrino, the Executive Director of Fiscal Services for the Local Board, sent an email to representatives of Frederick Classical advising them of their financial information for the 2013-2014 school year ("2014 Fiscal Year"), which was Frederick Classical's first year of operation. The email stated that Frederick Classical's 2014 Fiscal Year per-pupil allocation would be $8818.54, resulting in the school receiving approximately $2.4 million in total funds based on an enrollment of 280 students. Attached to that email were several charts, including a chart showing how the Local Board had reached the per-pupil allocation for the 2014 Fiscal Year:[8]

_____

[8] The following chart has been slightly modified from its original appearance in the record for page formatting purposes.

18

|  | [LOCAL BOARD] | STATE BOARD |
|---|---|---|
| **TOTAL OPERATING BUDGET** | $532,697,886 | $532,697,886 |
| **RESTRICTED BUDGET** | ($75,454,769) | ($75,454,769) |
| **TOTAL UNRESTRICTED BUDGET** | $457,243,117 | $457,243,117 |
| **FURTHER ADJUSTMENTS FOR IN-KIND SERVICES** | ($99,192,999) | $0 |
| **TOTAL BUDGET AFTER ADJUSTMENTS** | $358,050,118 | $457,243,117 |
| **ESTIMATED ENROLLMENT** | 40,668 | 40,668 |
| **PER[-]PUPIL AMOUNT** | $8,804.22 | $11,243.31 |
| **2% ADMINISTRATIVE COSTS** | $0 | ($224.87) |
| **INITIAL PER[-]PUPIL AMOUNT (CASH)** | $8,804.22 | $11,018.44 |
| **IN-KIND ADD-INS** | $1,655.64 | $0.00 |
| **TRANSPORTATION DEDUCTION** | $0.00 | ($544.26) |
| **AVERAGE PER PUPIL[-]AMOUNT ADJUSTED** | $10,459.86 | ($10,474.18) |
| **[DIFFERENCE BETWEEN LOCAL BOARD AND STATE BOARD]** | | **($14.32)** |

In the first column of that chart, the Local Board broke down how it had calculated the per-pupil allocation under its own preferred approach. The Local Board started with the county's total education operating budget for the 2014 Fiscal Year ($532,697,886). The first step in its calculation process was to deduct all funds targeted for specific programs and services that it placed in a "restricted budget" ($75,454,769) to reach a "total unrestricted budget" figure ($457,243,117). Then, the Local Board further deducted

additional funds for "further adjustments for in-kind services" ($99,192,999).[9]  The "total budget after adjustments" ($358,050,118) was then divided by the estimated enrollment of all students in the system (40,668), reflecting both students in traditional public schools as well as charter schools.  This resulted in an initial per-pupil amount of $8804.22.

The second column of the chart, according to the Local Board, showed its calculations applying a different formula, which it regarded as approved by the State Board in *Monocacy*.[10]  Applying that alternate formula, the Local Board employed the same first step as in its own formula: taking the county's total education operating budget for the 2014 Fiscal Year ($532,697,886) and deducting all funds targeted for specific programs and services placed in a "restricted budget" ($75,454,769) to reach a "total unrestricted budget" figure ($457,243,117).  However, instead of deducting for in-kind services, the Local Board divided the total unrestricted budget figure ($457,243,117) by total estimated enrollment (40,668) to reach a figure of $11,243.31.  Then, it deducted two percent for

---

[9] A separate chart attached to the email showed that the Local Board had included $934,097 in transportation funds in its "restricted budget" and $19,742,312 in other transportation funds excluded from charter schools as part of the funds for "further adjustments for in-kind services."

[10] Ms. Pellegrino, the Local Board's Executive Director of Fiscal Services, later stated in an affidavit that,

> When making the calculation for [Frederick Classical's] Per[-]Pupil Allocation, my office uses the same approach and formula that was [previously] used by the [Local Board] and approved in the State Board Opinion issued in *Monocacy Montessori Communities, Inc. v. Frederick County Board of Educ.*, MSBE Op. No. 06-17 (2006) and the chart prepared by my office utilizes the same formula shown [ ] at page 12 of that State Board Opinion.

administrative costs from that figure to reach an "initial per[-]pupil amount" of $11,018.44.

As a final step, the Local Board further reduced the "initial per[-]pupil amount" by a

"transportation deduction" ($544.26) to reach an "average per[-]pupil amount adjusted" of

$10,474.18. Although not clearly stated in the chart, the "transportation deduction"

appears to be a per-pupil figure for transportation costs.[11]

Even after deducting restricted funds and the "transportation deduction," the

$10,474.18 figure reached under the alternate formula based on *Monocacy* was

substantially greater than the $8804.22 per-pupil figure reached under the Local Board's

own preferred approach. But, in a final adjustment, the Local Board increased its own

figure by $1655.64, to reflect "in-kind add ins," apparently meaning the average per-pupil

cost of the in-kind services it provided to Frederick Classical. Thus the Local Board's final

figure under its own formula was $10,459.86, which was $14.32 less than the $10,474.18

figure it reached applying the alternate formula drawn from *Monocacy*.

Because the Local Board's average per-pupil amount reached under its own formula

was $14.32 less than that reached under the formula based upon *Monocacy*, it increased

the initial per-pupil amount reached under its own figure ($8804.22) by $14.32 in order to

reach Frederick Classical's 2014 Fiscal Year per-pupil allocation of $8818.54.

---

[11] When applying its own formula, the Local Board included transportation funds of $934,097 in its "restricted budget" and $19,742,312 in other transportation funds, which totals $20,676,409. But, strangely, the Local Board appears to have employed a separate "Transportation & Benefits" figure of $22,134,072 to calculate the per-pupil transportation figure of $544.26. This discrepancy between the transportation figures is not explained by anything in the record before this Court.

A separate funding calculation document was also included that divided all of the major categories in the Local Board's budget into smaller categories of funding, which were then designated as one of the following:

**In-Kind Services** are services provided to the Charter School based on specific service related determinates;

**Buy Backs** are services purchased back from the Charter School after the distribution of the allocation; and

**Per[-]Pupil Allocation (PPA)** indicates funds distributed to the [Charter [S]chool.

That document listed the following as "in-kind services:" the costs of employing a superintendent, a deputy superintendent, a Chief Operating Officer, other mid-level management, and the Local Board members; the costs for the Human Resources, Legal, Communication Services, Budget, Finance, Purchasing, Technology Services, and Curriculum Instruction, Assessment & Innovation departments; special education services; non-public placement for disabled students; a pupil personnel worker; the CASS program;[12] a school therapist; student health, including health room technicians and workers; and, food services.

Transportation was a category in the funding calculation document. Transportation was divided into two subcategories—student transportation and athletic transportation.

---

[12] "Community Agency School Services (CASS) is a department within the Student Services Division of Frederick County Public Schools" that provides social work services to local schools. Frederick County Public Schools, *Community Assisted School Services*, http://www.fcps.org/academics/community-agency-school-services-programs [https://perma.cc/B7NS-5GA3].

22

Student transportation was explained as "[b]us services for students to and from schools, field trips, extracurricular activities[,] and state approved nonpublic and state institutions and schools." The Local Board did not include a designation of in-kind services, buy backs, or per-pupil allocation for student transportation, but rather stated that student transportation was "[n]ot included in [Frederick Classical's] allocation, except In-Kind for [Individualized Education Plan] identified students and budgeted curricular field trips." Athletic transportation was explained as "[b]us services for athletic events[.]" Similarly, athletic transportation was "[n]ot included in [the] allocation" to Frederick Classical.

*Funding Dispute*

In the June 26, 2013 email that provided Frederick Classical's 2014 Fiscal Year per-pupil allocation figure and supporting documents, Ms. Pellegrino requested that Frederick Classical use the documents to submit a detailed operating budget by August 15, 2013. In response, Frederick Classical submitted to the Local Board a budget based on the Local Board's funding calculation and the $8818.54 per-pupil allocation figure.[13] However, in correspondence accompanying that budget proposal, Frederick Classical stated that "our submission of this budget does not constitute our assent to the per[-]pupil allocation formula [the Local Board] uses." Frederick Classical claimed that the Local Board's allocation formula was not consistent with Maryland law because it did not include transportation funding. And, Frederick Classical contended that the formula applied by the

---

[13] Frederick Classical was required to timely submit a budget to the Local Board under the terms of the charter agreement it had signed with the Local Board.

Local Board based on *Monocacy* "should not apply to charter schools generally." Finally, Frederick Classical asserted that based upon the Local Board's funding formula, "our charter school is being denied over $135,926.22 in real dollars over our first year, and increasing amounts in the second and third years."

For those reasons, Frederick Classical requested that the Local Board provide funding "in accordance with the law and include, at least, the Transportation category of funding in the calculation of [the 2014 Fiscal Year] per-pupil allocation and every year thereafter." Frederick Classical also requested that, if the Local Board did not agree to provide the funding, that it "state its reasoning in writing."

On September 25, 2013, the Local Board responded to Frederick Classical's request for additional funding. The Local Board stated that the "allocation [of funds was] based on the formula that has been previously accepted and approved by the Maryland State Board of Education as being consistent with Maryland law and the [Local] Board has determined that it is the formula that will be applied here." The denial letter did not provide any further explanation.

*Appeal to the State Board of Education*

On October 25, 2013, Frederick Classical appealed the Local Board's decision to the State Board, pursuant to ED § 2-205 and ED § 4-205[14] and COMAR 13A.01.05.02

---

[14] ED § 2-205(e)(2) states, "[e]xcept as provided in paragraph (4) of this subsection and in Title 6, Subtitles 4 and 5 of [the Education] [A]rticle, the [State] Board shall decide all controversies and disputes under these provisions." Pursuant to ED § 4-205(c)(3) a decision of a local school board involving the intent and meaning of public school laws

24

(describing the required contents of an appeal to the State Board, and a deadline to file the appeal "within 30 calendar days of the decision of the local board"). In its appeal filing, Frederick Classical asserted that the Local Board's decision to withhold the transportation funds when calculating its allocation denied it commensurate funding for the 2014 Fiscal Year to operate the charter school, as required by ED § 9-109. In support of that contention, Frederick Classical noted that its charter agreement with the Local Board "specifically invoke[d] and incorporate[d] [ED] § 9-109," by stating that "the [Local] Board shall disburse to [Frederick Classical] an amount of county, state, and federal money for elementary, middle, and secondary students that is commensurate with the amounts distributed to other public schools in the local jurisdictions." And, Frederick Classical cited the *City Neighbors* declaratory rulings, where the State Board had interpreted the ED § 9-109 "commensurate" funding provision to mean a county board was required to provide a charter school with a proportional per-pupil allocation of funds, including funds budgeted for services such as transportation. Frederick Classical also attempted to distinguish the State Board's ruling in *Monocacy*, asserting that in that opinion the State Board upheld an exclusion of transportation funds "only because [MMCI] had freely and expressly agreed to forego those funds it was otherwise eligible to receive," which it asserted was "emphatically not the case here." Frederick Classical requested that the State Board reverse the Local Board's decision and direct the Local Board to provide the appropriate

---

may be appealed to the State Board if the appeal is "taken in writing within 30 days after the decision of the [local school] board."

25

level of funding. In the alternative, Frederick Classical petitioned the State Board for a declaratory ruling directing that the Local Board revise its funding allocation to Frederick Classical.

The Local Board filed a response to Frederick Classical's appeal and a motion for summary affirmance, with a memorandum in support. The Local Board's supporting memorandum stated that the current method of calculating the per-pupil allocation was "correct and proper" as it was based on the formula that the State Board applied in its decision in *Monocacy*, which it asserted was "fully dispositive of the issues raised" in the appeal. The Local Board contended—inaccurately—that the charter agreement transportation provision in *Monocacy* was "exactly the same" as the similar provision in Frederick Classical's charter agreement.[15] Lastly, the Local Board contended that "it would be irrational and unreasonable for the [Local] Board to pay Frederick Classical an amount of money that would represent the per-pupil amount of its Transportation budget in a circumstance where the Charter Agreement expressly provides that the [Local] Board has no general responsibility for transportation."

Frederick Classical filed a Reply to the Local Board's Response, claiming that the Local Board mischaracterized the *Monocacy* opinion and that the only relevant ruling in

---

[15] In fact, the provision in *Monocacy* stated that "transportation shall be the responsibility of [the Charter School] except for students who live along an established route and for special education students," with certain narrow exceptions. *Monocacy*, MSBE Op. No. 06-17 at 8. In contrast, the relevant provision in Frederick Classical's charter agreement was that "transportation shall be the responsibility of [Frederick Classical] families" with certain exceptions.

*Monocacy* was "that a charter school may agree that it is 'not entitled to transportation dollars contained in the [local board's] [Total] Operating Budget.'" *See Monocacy*, MSBE Op. No. 06-17 at 9. Frederick Classical contended that *Monocacy* was not dispositive because, unlike the charter school in that case, it had never agreed that it was not entitled to transportation dollars. Frederick Classical also noted the discrepancy described above between the transportation provision in its charter compared with the provision at issue *Monocacy*. It claimed that the language in its charter that Frederick Classical families would be responsible for transportation did not reflect a voluntary agreement to surrender transportation funding, because those parents were not parties to the contract. And, it also highlighted additional language in its charter agreement that provides that "[i]f [Frederick Classical] subsequently determines to provide transportation during the term of this Charter, it may contract with an approved provider for transportation services . . ." Frederick Classical maintained that language indicates that it "clearly [had] contractually retained the right to provide transportation to its students." Finally, Frederick Classical asserted that because it had not contractually surrendered the transportation funding, it was entitled to that funding even if it was not providing transportation, as in its view "[c]harter schools are entitled to funding commensurate with other public schools, which they may allocate as they see fit."

On May 20, 2014, the State Board issued its opinion in this matter, without holding a hearing. *Frederick Classical Charter Sch., Inc. v. Frederick Cty. Bd. of Educ.*, MSBE Opinion No. 14-21 (May 20, 2014). The State Board's opinion summarized the standard of review that it was applying:

> This appeal concerns a controversy or dispute regarding the rules and policies of a local board. Accordingly, the local board's decision "must be considered *prima facie* correct" and upheld unless [Frederick Classical] proves that the local board's decision was arbitrary, unreasonable, or illegal. *See* COMAR 13A.01.05.05; *Kitzmiller Charter* [*Sch.*] *Initiative, Inc. v. Garrett County Bd. of Educ.*, MSBE Op. No. 13-52 (2013).

*Id.* at 2. The State Board began its legal analysis by summarizing its previous rulings on the commensurate funding requirement of ED § 9-109 in the *City Neighbors* declaratory rulings and in *Monocacy*, as well as the claims raised by the parties in their appeal filings. *Id.* at 2-4.

Applying its prior decisions to the facts of the case, the State Board concluded that Frederick Classical was not entitled to transportation funds as part of its per-pupil allocation. The State Board's explanation as to how it reached that conclusion, though at times muddled, made two distinct points. First, the State Board determined that because Frederick Classical did not provide transportation services, Frederick Classical was not entitled to the transportation funding under ED § 9-109 and the State Board's prior ruling in *Monocacy*. The State Board found that requiring county school boards to "provide charter schools with a lump sum without regard to the services provided" would be contrary to its previous ruling in *Monocacy*, and that "a charter school is not automatically entitled to funds for services it does not provide." *Id.* at 4. Rather, it stated that whether transportation costs are among the funds included in calculating a per-pupil allocation "will depend on the nature of the arrangement between the local school system and the charter school" as to those services. *Id.* Applying that standard to the facts, the State Board found that "if [Frederick Classical] received funds for services [that] it did not provide, it would

28

be receiving more than its commensurate share of county funds," and that it was "not arbitrary, unreasonable, or illegal for [the Local Board] to consider the actual services provided by [Frederick Classical] to reach a commensurate level of funding." *Id.* at 4-5. The State Board thus concluded that withholding transportation funds from the per-pupil allocation was "not contrary to state law" and that the formula employed by the Local Board "is consistent with our past rulings." *Id.* at 5.

Second, the State Board found that Frederick Classical was not entitled to the transportation funding because of language in its charter agreement with the Local Board. As noted above, the charter agreement provided that transportation "shall be the responsibility of [Frederick Classical] families" with certain limited exceptions. The State Board concluded that, "[i]n our view, a plain reading of the Charter language indicates that [Frederick Classical] is not responsible for providing transportation." *Id.* at 4. And, the State Board interpreted its decision in *Monocacy* as standing for a broad proposition that if a charter school "agreed to cover transportation (except for certain students)" then the cost of transportation services per-pupil should be deducted from its per-pupil allocation. *Id.* at 5. The State Board acknowledged that the language in the Frederick Classical charter agreement differed from the language of the agreement at issue in *Monocacy*, which provided that transportation generally "shall be the responsibility of [the charter school]." *Id.* at 4-5 (quoting *Monocacy*, MSBE Op. No. 06-17 at 9). Nevertheless, the State Board concluded that the charter language at issue meant that "[Frederick Classical] has [ ] agreed that it is not entitled to [transportation] funds by virtue of having parents take on the responsibility for transportation." *Id.* at 5.

For those reasons, the State Board denied Frederick Classical's request that it reverse the Local Board's funding decision, and likewise denied its alternative request that it issue a declaratory ruling that the Local Board's ruling was contrary to Maryland law and must be revised. *Id.* at 5.

*Circuit Court for Frederick County*

On June 18, 2014, Frederick Classical petitioned the Circuit Court for Frederick County for judicial review. On December 8, 2014 the circuit court held a hearing and thereafter took the matter *sub curia*. On February 5, 2015, the circuit court filed a written opinion affirming the decision of the State Board. The circuit court held that the State Board was correct to have cited and applied the deferential standard of review described in COMAR 13A.01.05.05(A)-(C). As to the merits of the State Board's decision, the circuit court held that, under ED § 9-109 and *Monocacy*, the formula stated in the *City Neighbors* declaratory rulings "is not mandatory," and therefore the Local Board was not required to apply it. And, the circuit court found that, pursuant to *Monocacy*, "a local board is not required to provide [funds] for transportation when [a] charter school does not provide [that] service." Therefore, as Frederick Classical did not provide transportation services, the circuit court found that the State Board had correctly upheld the Local Board's decision to withhold the transportation funds.

*Court of Special Appeals*

On March 6, 2015, Frederick Classical appealed the judgment of the circuit court to the Court of Special Appeals of Maryland. On March 31, 2016, the Court of Special Appeals issued a reported opinion, in which it affirmed the holding of the circuit court and

the State Board. *Frederick Classical Charter Sch., Inc. v. Frederick Cty. Bd. of Educ.*, 227 Md. App. 439 (2016). The Court of Special Appeals stated that the appeal presented a single issue for its review, which it had rephrased: "Did the State Board err in finding that the Local Board provided full funding despite the fact that it did not include transportation funding in Frederick Classical's funding allocation?" *Id.* at 443.

The Court of Special Appeals considered whether the State Board had erred by applying the deferential standard of review under COMAR 13A.01.05.05(A)-(C). The Court of Special Appeals determined that "[i]n view of the heavy deference that must be accorded to State Board of Education interpretations of the public school laws and its own regulations," the State Board did not err in applying the deferential standard of review. *Id.* at 451 n.5.

The Court of Special Appeals then addressed the State Board's interpretation of the transportation language in Frederick Classical's charter agreement. The intermediate appellate court agreed with the State Board that "the plain language of the charter [agreement] clearly shifts the responsibility for transportation from [the Local Board] to Frederick Classical families." *Id.* at 454. Therefore, the intermediate appellate court found no error as to the State Board's additional interpretation of that provision as meaning that Frederick Classical was not entitled to transportation funds. *Id.*

Then, turning to the issue of whether the State Board had correctly determined that the Local Board could withhold transportation funds from its calculation of Frederick Classical's per-pupil allocation, the Court of Special Appeals determined that the State Board's ruling was consistent with its prior decisions in the *City Neighbors* declaratory

rulings and *Monocacy*, as well as this Court's holding in *City Neighbors*. *Id.* at 454-58. Citing to the guidance documents attached to the *City Neighbors* declaratory rulings, the Court of Special Appeals stated that the State Board in the *City Neighbors* declaratory rulings "appreciated that transportation [funds] may, but [do] not have to be, included in the funds provided to a charter school." *Id.* at 455. Therefore, it determined that the State Board's decision in the instant case "is not inconsistent with its *City Neighbors* [declaratory rulings decision]." *Id.* And, the Court of Special Appeals construed this Court's decision in *City Neighbors*, 400 Md. 324, as standing for the proposition that a county school board could not require "the *mandatory* exclusion of transportation funds from [a] per[-]pupil allocation amount," but that this Court did not make an "affirmative holding that transportation funds can never be excluded from the funds disbursed to a charter school." *Id.* at 455-56 (emphasis in original). In support of its construction of *City Neighbors*, the Court of Special Appeals cited a 1997 State Department of Education guideline document that stated that "[o]ther fiscal support such as transportation may be part of the negotiations between the charter requestor and the local education authority." *Id.* at 456 (quoting *City Neighbors*, 400 Md. at 350 (citing Maryland State Department of Education, *Guidelines for Use by Local School Systems in Considering Charter School Applications* (July, 1997), at 8)).

The Court of Special Appeals also determined that the State Board's ruling was in accordance with the State Board's prior decision in *Monocacy*. The Court of Special Appeals regarded *Monocacy* as having clarified that the "language [the State Board] used in [the *City Neighbors* declaratory rulings] should not be strictly construed, and that the

formula it announced there was not the only way a local school board could distribute funding to a charter school." *Id.* at 456. And, the Court of Special Appeals determined that the State Board's position "that if [Frederick Classical] received funds for services it did not provide, it would be receiving more than its commensurate share of county funds" was announced in *Monocacy*, "albeit using different words." *Id.* at 457. Specifically, the Court of Special Appeals noted that the State Board had stated in *Monocacy* that "[i]f MMCI were entitled to the full per[-]pupil amount, however, MMCI would receive an amount greater than an 'equal amount of funds.'" *Id.* (quoting *Monocacy*, MSBE Op. No 06-17 at 9).

Finally, the Court of Special Appeals agreed with the State Board that, even though "Frederick Classical's charter places the responsibility for transportation on Frederick Classical families," as opposed to the provision at issue in *Monocacy* that placed responsibility on the charter school itself, "the outcome is the same." *Id.* In the Court of Special Appeals' view, if a charter agreement "provides that either the charter school or families have a duty to transport the students, the result is that the local school system is *not* responsible for the transportation or for including funds for transportation in a per[-]pupil allocation." *Id.* (emphasis in original).

The Court of Special Appeals also dismissed additional contract interpretation and policy arguments raised by Frederick Classical. In terms of contract interpretation, the Court of Special Appeals was not persuaded that "the families of [Frederick Classical] are not parties to the [charter], and so cannot be deemed to have voluntarily contracted to surrender portions of [Frederick Classical's] funding," or that the contract should be

construed against the Local Board "because the [L]ocal [B]oard prepared the document." *Id.* at 458-59. The Court of Special Appeals also discounted Frederick Classical's claim that "by failing to disburse transportation funding, [the Local Board] retained that money in the system-wide budget, 'inevitably redistributing and spending those funds on other students in the school district.'" *Id.* at 458. Instead, the Court of Special Appeals agreed with the Local Board's assertion that its transportation budget represented a fixed "total cost to actually transport students living in the transportable areas and for special education students needing specialized transportation," a population that, aside from certain special education students, did not include any charter school students "who are not entitled to transportation." *Id.*

Frederick Classical thereafter petitioned this Court for writ of certiorari, which was granted on July 11, 2016. *Frederick Classical Charter Sch. v. Frederick Cty. Bd. of Educ.*, 448 Md. 724 (2016).

Frederick Classical presents three questions for our review, which we have reordered and restated as follows:

1. Did the State Board err by applying a deferential standard of review to the Local Board's decision to exclude transportation funds when calculating Frederick Classical's per-pupil allocation?

2. Did the State Board err in affirming the Local Board's decision to exclude transportation funds when calculating Frederick Classical's per-pupil allocation on the ground that, pursuant to ED § 9-109 and its own precedent, Frederick Classical was not entitled to those funds when it did not provide transportation services?

3. Did the State Board err in affirming the Local Board's decision to exclude transportation funds when calculating Frederick Classical's per-pupil

allocation on the basis of its finding that Frederick Classical had contractually agreed that it was not entitled to transportation funds?[16]

## II.
## STANDARD OF REVIEW

"When this Court sits in review of an administrative agency decision, we reevaluate the decision of the agency under the same statutory standards as would the circuit court; we do not employ those standards to reevaluate the decision of the circuit or intermediate appellate court." *Spencer v. Md. State Bd. of Pharmacy*, 380 Md. 515, 523, (2004). Thus, our inquiry "is not whether the Court of Special Appeals erred, but whether the administrative agency erred." *Id.*

---

[16] Frederick Classical included two questions presented in its petition for writ of *certiorari*:

1. Did the State Board err in finding that Frederick Classical contractually agreed in the [charter agreement] to forego funding proportionate to the Local Board's transportation spending because Frederick Classical students would not necessarily receive transportation from Frederick Classical?

2. Did the State Board err by deferring to the Local Board's interpretation of the [charter agreement] and application of State law, and misstating its own precedent?

We have reordered and restated the second part of the second question presented referring to whether the State Board erred by "misstating its own precedent," into a standalone question presented (the second of our three reordered questions presented). The reference to the State Board "misstating its own precedent" is somewhat ambiguous in isolation. However, in the context of the overall petition it is clear that Frederick Classical was referring to its claim that the State Board's conclusion that Frederick Classical was not entitled to transportation funding when it did not provide transportation services was contrary to the State Board's own precedent interpreting the commensurate funding requirement of ED § 9-109 in the *City Neighbors* declaratory rulings and *Monocacy*. That issue was raised before the State Board and addressed in its decision, was likewise raised before the circuit court and the Court of Special Appeals, and was fully briefed to this Court by the parties. Therefore it is clearly properly before this Court. *See* Md. Rule 8-131(a).

In this case we are reviewing the decision of the State Board.  Section 2-205 of the Education Article enumerates the powers and duties of the State Board including, in § 2-205(e), the State Board's authority to explain the intent and meaning of the Education Article and Maryland education policy.  In pertinent part, that section provides,

> (1) Without charge and with the advice of the Attorney General, the State Board shall explain the true intent and meaning of the provisions of:
>     (i) This article that are within its jurisdiction; and
>     (ii) The bylaws, rules, and regulations adopted by the Board.
>
> (2) . . . [T]he Board shall decide all controversies and disputes under these provisions.
>
> (3) The decision of the Board is final.
>
> . . .

Pursuant to § 2-205, the State Board "has very broad statutory authority over the administration of the public school system in this State, [and] that the totality of its statutory authority constitutes a visitatorial power of such comprehensive character as to invest the State Board with the last word on any matter concerning educational policy or the administration of the system of public education."  *City Neighbors*, 400 Md. at 342-43 (2007) (quoting *Bd. of Educ. of Prince George's Cty. v. Waeldner*, 298 Md. 354, 359-62 (1984)).  We have previously explained the scope and purpose of this "visitatorial" power:

> We think it beyond question that the power of visitation vested in the State Board is one of general control and supervision; it authorizes the State Board to superintend the activities of the local boards of education to keep them within the legitimate sphere of their operations, and whenever a controversy or dispute arises involving the educational policy or proper administration of the public school system of the State, the State Board's visit[atorial] power authorizes it to correct all abuses of authority and to nullify all irregular proceedings.

*Bd. of Educ. of Talbot Cty. v. Heister*, 392 Md. 140, 153-54 (2006) (footnote omitted) (quoting *Zeitschel v. Bd. of Educ.*, 274 Md. 69, 81 (1975)).

"[T]he broad statutory mandate given to [the State Board] requires that special deference be given to its interpretation of statutes that it administers." *City Neighbors*, 400 Md. at 343. That deference is over and above that generally afforded to other administrative agencies; "[w]hile administrative agencies generally may interpret statutes, as well as rule upon other legal issues, and while an agency's interpretation of a statute which it administers is entitled to weight, the paramount role of the State Board of Education in interpreting the public education law sets it apart from most administrative agencies." *Id.* (quoting *Bd. of Educ. for Dorchester Cty. v. Hubbard*, 305 Md. 774, 790-91 (1986) (footnote omitted)).

However, the discretion that courts afford to the State Board "is not unlimited." *Id.* We have recognized that there are at least "four instances where judicial review may be more expansive in its inquiry:

(1) the matter involves a purely legal question;

(2) the State Board has contravened state statute;

(3) the State Board exercised its power in bad faith, fraudulently, or in breach of trust; or

(4) the State Board exercised its power arbitrarily or capriciously.

*Bd. of Educ. of Talbot Cty. v. Heister*, 392 Md. 140, 154 n.13 (2006) (quoting *Hurl v. Bd. of Educ. of Howard Cty.*, 107 Md. App. 286, 299 (1995) (additional citations and internal quotations marks omitted).

## III.
## DISCUSSION

### A. *The Standard of Review in the State Board's Opinion*

Frederick Classical contends that the State Board incorrectly viewed the Local Board's decision as one that involves "a controversy or dispute regarding the rules and policies of a local [school] board," and consequently erred in applying the standard of review for such local school board decisions that they "must be considered *prima facie* correct and upheld" by the State Board unless deemed "arbitrary, unreasonable, or illegal." *See* COMAR 13A.01.05.05(A)-(C). Frederick Classical asserts that the State Board not only failed to identify any local policy that was at issue in the parties' dispute, but expressly stated in its decision that the "appeal concern[ed] the allocation of money to public charter schools and the State Board's interpretation of commensurate funding." *See Frederick Classical Charter Sch., Inc.*, MSBE Op. No. 14-21 at 2. According to Frederick Classical, the State Board should have instead applied a *de novo* standard of review defined in COMAR 13A.01.05.05(E) because the Local Board's decision, and Frederick Classical's appeal from that decision, "presented the State Board [with] questions regarding the explanation and interpretation of a contract, State public school laws, and the State Board's prior opinions."

The Local Board responds by stating that the State Board utilized the appropriate standard of review because the issue before the State Board concerned "the formulation and calculation of the amount of funding a [local school] board disbursed to a charter school," which, according to the Local Board, is a controversy or dispute regarding the

38

rules and policies of a local board. In the alternative, the Local Board contends that even if the State Board incorrectly *stated* the standard of review, the State Board's decision shows that it actually *applied* the correct standard of review and exercised its independent judgment. Finally, the Local Board claims that even if the State Board both cited and applied the incorrect standard of review, this error was "irrelevant in a case like this one, which turns not on factual disputes, but rather on statutory interpretation, [and] where the standard of review specifically includes 'illegal' as one of the grounds for reversal."

COMAR 13A.01.05.05(A)-(C) describes the standard of review that the State Board applies to local school board decisions on matters involving a local policy or a local dispute:

A. General. Decisions of a local board involving local policy or a controversy and dispute regarding the rules and regulations of the local board shall be considered prima facie correct, and the State Board may not substitute its judgment for that of the local board unless the decision is arbitrary, unreasonable, or illegal.

B. A decision may be arbitrary or unreasonable if it is one or more of the following:
(1) It is contrary to sound educational policy; or
(2) A reasoning mind could not have reasonably reached the conclusion the local board or local superintendent reached.

C. A decision may be illegal if it is one or more of the following:
(1) Unconstitutional;
(2) Exceeds the statutory authority or jurisdiction of the local board;
(3) Misconstrues the law;
(4) Results from an unlawful procedure;
(5) Is an abuse of discretionary powers; or
(6) Is affected by any other error of law.

COMAR 13A.01.05.05(E) describes the standard of review that the State Board applies to local board decisions involving the interpretation of state public school laws or of State Board policies:

> E. State School Laws and Regulations. The State Board shall exercise its independent judgment on the record before it in the explanation and interpretation of the public school laws and State Board regulations.

Thus, pursuant to COMAR 13A.01.05.05(A)-(C), the State Board applies a deferential standard of review to purely local policies or disputes, regarding the local school board decision as "*prima facie* correct" and narrowing its review only to whether the decision was "arbitrary, unreasonable, or illegal." But, pursuant to COMAR 13A.01.05.05(E), the State Board does not defer to local school board determinations when the issue presented for its review involves the explanation and interpretation of the public school laws and State Board regulations," but instead must "exercise its independent judgment" in a *de novo* review.

As we noted in *City Neighbors*, these separate and distinct standards of review are also supported by case law precedent:

> [An] unbroken and consistent line of cases supports the precepts embodied in COMAR 13A.01.05.05.—that (1) decisions of a local board involving a *local* policy or a dispute regarding rules or regulations of the *local board* shall be considered by [the State Board] as *prima* [*facie*] correct, and [the State Board] will not substitute its judgment for that of the local board in such cases unless the local decision is arbitrary, unreasonable, or illegal, but (2) [the State Board] shall exercise its independent judgment on the record before it in the explanation and interpretation of the State public school laws and State Board regulations.

400 Md. at 343-44.

As described above, *City Neighbors* involved a set of cases in which the State Board considered whether funding decisions of local boards, including to exclude certain categories of funds from its calculation of a per-pupil allocation to a charter school, was permissible under ED § 9-109. *Id.* at 331-35. We held that in that situation, "[the] State Board was construing a State statute, not a local [school] board policy or regulation," and therefore "owed little deference to the city and [local school] board decisions, but was required to exercise its own independent judgment as to the proper interpretation of ED § 9-109[.]" *Id.* at 344.

Similarly, in the instant case, the primary issue presented by Frederick Classical's appeal centered on the "proper interpretation of ED § 9-109," as clarified in the State Board's own prior precedent and this Court's holding in *City Neighbors*. Frederick Classical's main contention on appeal to the State Board was that the Local Board's decision to exclude the transportation funds when calculating its allocation denied it commensurate funding under ED § 9-109. And, in their respective appeal filings, the parties focused on whether the Local Board's decision to exclude those transportation funds was consistent with State Board precedent interpreting ED § 9-109, namely in the *City Neighbors* declaratory rulings and *Monocacy*.

The State Board opinion reflects that the issues it was deciding involved the commensurate funding requirement of ED § 9-109 and its precedent interpreting that requirement. The State Board began its legal analysis in the opinion by summarizing its previous rulings interpreting ED § 9-109 in the *City Neighbors* declaratory rulings and in *Monocacy*. *Frederick Classical Charter Sch., Inc.*, MSBE Op. No. 14-21 at 2-4. Then,

41

when evaluating the parties' claims, the State Board interpreted the "commensurate" funding requirement of ED § 9-109 and its own precedent. It determined that "if [Frederick Classical] received funds for services [that] it did not provide, it would be receiving more than its commensurate share of county funds" and that it was "not arbitrary, unreasonable, or illegal for a county to consider the actual services provided by [Frederick Classical] to reach a commensurate level of funding." *Id.* at 4-5. And, it denied Frederick Classical's request for a declaratory ruling because it found that withholding transportation funds from the per-pupil allocation was "not contrary to state law" and that the formula employed by the Local Board "is consistent with [its] past rulings." *Id.* at 5.

The appeal to the State Board also presented a separate contract interpretation issue, but one that likewise centered on ED § 9-109 and the commensurate funds requirement. Frederick Classical contended before the State Board that it was entitled to the inclusion of the transportation funds in the per-pupil allocation because its charter agreement with the Local Board "specifically invoke[d] and incorporate[d] [ED] § 9-109," by stating that "[the Local Board] shall disburse to [Frederick Classical] an amount of county, state, and federal money for elementary, middle, and secondary students that is commensurate with the amounts distributed to other public schools in the local jurisdictions." Furthermore, in resolving the parties' dispute as to the meaning and significance of the charter agreement language, the State Board relied primarily upon its decision in *Monocacy*. The State Board interpreted its decision in *Monocacy* as standing for a broad proposition that if a charter school "agreed to cover transportation (except for certain students)" then the cost of transportation services per-pupil should be deducted from its per-pupil allocation.

*Frederick Classical Charter Sch., Inc.*, MSBE Op. No. 14-21 at 4-5. On that basis, the State Board found that "[Frederick Classical] has [ ] agreed that it is not entitled to [transportation] funds by virtue of having parents take on the responsibility for transportation." *Id.* at 5.

Thus, the only issues that were before the State Board and decided in its opinion were: (1) whether transportation funds must be included in Frederick Classical's per-pupil allocation pursuant to the commensurate funds requirement contained in ED § 9-109; and, (2) whether Frederick Classical had contractually waived its right to the inclusion of transportation funds in its commensurate funding allocation through its charter agreement. Both of those issues involve an interpretation of ED § 9-109 and prior State Board precedent. Moreover, the State Board did not consider or address any local policy or rules of the Local Board.[17] As we stated in *City Neighbors*, to permit local school boards to determine "what funding is commensurate with the amounts disbursed to the other public schools" pursuant to ED § 9-109 "by methodologies of their choosing" is impermissible because it "raises the specter of 24 disparate methods of implementing a uniform State law

---

[17] As noted in Frederick Classical's brief, the Local Board did have a policy "applicable to charter school funding," which provides

> [A]n approved public charter school shall receive funding as determined by Maryland law which may be comprised of discretionary funding and in-kind services. Annual funding will be based on a contractually agreed upon enrollment and provided on a "per[-]pupil" basis.

Board of Education of Frederick County, Maryland, Policy 440.3(I). However, not only did the State Board not refer to that policy in its decision, the policy merely reflects the Local Board's incorporation of controlling Maryland law into its own policies.

and would denigrate the [State Board's] long-established authority to explain the true intent and meaning of the public education laws that it is charged with enforcing." 400 Md. at 346-47.

We therefore hold that the State Board erred by incorrectly articulating and applying the standard of review set forth in COMAR 13A.01.05.05(A)-(C) for local policy or disputes,[18] and that the State Board should have applied the standard of review set forth in COMAR 13A.01.05.05(E), and "exercise[d] its independent judgment on the record."

We cannot say, as the Local Board urges, that even if the State Board *cited* the incorrect standard of review that was deferential to the Local Board's decision, its opinion shows that it actually *applied* the correct standard and "exercise[d] its independent judgment." First, we note that the State Board made its determination without a hearing, and therefore the record is devoid of evidence that the State Board actually examined and

---

[18] In support of its application of the more deferential standard of review in COMAR 13A.01.05.05(A)-(C), the State Board cited *Kitzmiller Charter School Initiative, Inc. v. Garrett County Board of Education*, MSBE Op. No. 13-52 (2013). In *Kitzmiller*, a charter school appealed a local school board's decision denying the charter school's application. *Id.* at 1. The State Board acknowledged that the appeal involved both local policies and the public charter school law, which required the State Board in that case to give deference to the local policy decisions and to exercise its independent judgment to the extent that the Board explained and interpreted the public charter school law. *Id.* at 2-3. *Kitzmiller* is dissimilar from the instant case, where the State Board only cited to and applied the more deferential standard of review for local decisions, and thus does not support the State Board's complete failure to apply the proper "independent judgment" standard of review for decisions involving the public school laws.

reviewed the positions and arguments of each side and made an independent review of the record.

Second, the State Board's decision indicates that it did not apply such an independent review but instead deferred to the position advanced by the Local Board. The State Board's legal conclusions were strikingly similar to those of the Local Board in its denial letter to Frederick Classical and filings to the State Board in the appeal. In the denial letter, the Local Board stated that "[its] allocation [of funds was] based on the formula that has been previously accepted and approved by the Maryland Stated Board of Education as being consistent with Maryland law and the [Local] Board has determined that it is the formula that will be applied here." And, in its response and supporting memorandum to Frederick Classical's appeal, the Local Board stated that the current method of calculating the per-pupil allocation was "correct and proper" as it was based on the formula which the State Board applied in its decision in *Monocacy*, which it asserted was "fully dispositive of the issues raised" in the appeal. The State Board's decision to affirm the funding formula mirrored the Local Board's view and concluded that the Local Board's decision to exclude transportation funds while calculating the per-pupil allocation "was not contrary to State law and the formula used by the [L]ocal [B]oard is consistent with our past rulings." And, the State Board likewise relied almost exclusively upon its *Monocacy* ruling to reach that result.

In contrast, in its evaluation of the parties' claims the State Board did not rely upon the *City Neighbors* declaratory rulings, which was the precedent upon which Frederick

45

Classical primarily relied in its filings to the State Board.[19] Thus, the record reflects that the State Board did not apply a thorough, independent judgment as to whether the Local Board's allocation was consistent with its prior decisions and the underlying statute. Instead, it appears that the State Board deferred to the decision of the Local Board, and the Local Board's reasoning in support of that decision.

Nor can we say that the State Board's error in stating the incorrect standard of review was "irrelevant" to its decision. The Local Board correctly points out that even the more deferential standard of review in COMAR 13A.01.05.05(A)-(C) requires the State Board to reverse local school board decisions that are "arbitrary, unreasonable, or illegal." And, it notes that COMAR 13A.01.05.05(C) states that a local school board's "decision may be illegal if," among other things, it "misconstrues the law," "is an abuse of discretionary powers," or "is affected by any other error of law." Thus, the Local Board urges us to conclude that "if the State Board [had] agreed with Frederick Classical's [claim] that the [Local] Board's allocation formula misconstrued the law, was an abuse of its powers, or was affected by any other error of law, it would have reversed the [Local] Board's funding formula, whatever standard it applied."

However, the Local Board ignores the other half of the more deferential standard of review for purely local policies and disputes in COMAR 13A.01.05.05(A), namely, that the State Board must view the Local Board decision as "*prima facie* correct." An

---

[19] Prior to its analysis of the parties' claims, the State Board did briefly discuss the *City Neighbors* declaratory rulings in its opinion as part of its summary of its previous rulings as to ED § 9-109 and the commensurate funds requirement.

administrative agency decision that is *prima facie* correct carries with it "the presumption of validity," and a court or other reviewing body must therefore view the decision "in the light most favorable to the agency." *See Giant Food, Inc. v. Dep't of Lab., Licensing & Reg. et al.*, 356 Md. 180, 185 (1999) (citing *Catonsville Nursing Home, Inc. v. Loveman*, 349 Md. 560, 569 (1998)). Thus, in this case, the State Board may have been predisposed to accept the Local Board's claim that its allocation formula was merely an application of State Board precedent from *Monocacy*, and to distinguish or discount the claims raised by Frederick Classical that suggest that the Local Board's decision was incorrect.

Our view that the Local Board erred in applying the more deferential standard of review stated in COMAR 13A.01.05.05(A)-(C) is at odds with the Court of Special Appeals, below, which determined that, "[i]n view of the heavy deference that must be accorded to State Board [ ] interpretations of the public school laws and its own regulations," the State Board did not err in applying that standard. *Frederick Classical Charter Sch., Inc.*, 227 Md. App. at 451 n.5. We agree with the Court of Special Appeals that the State Board is accorded a significant amount of judicial deference in the interpretation of its own regulations, including its decision as to which of the standards of review in COMAR 13A.01.05.05 apply to a given situation. However, that deference does not extend to upholding the State Board's decision to apply the more deferential standard of review when the issue before the State Board did not involve any local policy or local dispute, and the record indicates that the State Board improperly deferred to the decision or arguments of a local school board instead of applying the much more stringent "independent judgment" standard of review.

47

***B. The State Board's Ruling That Frederick Classical Was Not Entitled to the Inclusion of Transportation Funds in Its Per-Pupil Allocation When It Did Not Provide Transportation Services***

Frederick Classical contends that the State Board erred in affirming the Local Board's decision to exclude transportation funds from its per-pupil allocation on the basis that, under ED § 9-109 and its own precedent, Frederick Classical was not entitled to those funds when it did not provide transportation services. Frederick Classical claims that the State Board's decision was contrary to its own *City Neighbors* declaratory rulings, affirmed by this Court in *City Neighbors*, 400 Md. 324. According to Frederick Classical, those decisions "demonstrate that a charter school operator is to receive funding even if the charter school is not providing a 'service' that the local board generally provides [ ] so long as the charter school does not request the local school system [ ] provide [ ]the service." Frederick Classical thus asserts that it is entitled to the full per-pupil allocation under the formula in *City Neighbors* and "which it can use to prioritize and fund its innovative programs."

Frederick Classical also insists that the State Board's decision in *Monocacy* does not support that proposition that "a charter school operator does not receive funding associated with categories of services it does not provide." Frederick Classical notes that the charter school operator in that case was, in fact, providing transportation services. Moreover, Frederick Classical maintains that the statement in *Monocacy* which the Court of Special Appeals determined supports the State Board's decision here—that if the charter school in *Monocacy* "were entitled to the full per[-]pupil amount" that it had claimed, it would "receive an amount greater than an 'equal' amount of funds"—is "concerned an

48

entirely different and distinct subject matter" than at issue in this case. According to

Frederick Classical, that statement in *Monocacy* refers only to a situation where a charter

school requested certain in-kind services from a local board, in which case the charter

school must "buy back" the costs of those services through a deduction from its per-pupil

allocation, so that the charter school "does not get both the cash and the [services]."

However, Frederick Classical insists that the costs of transportation should not be deducted

in its case, because "it is not purchasing a service from the local board with the $544.26

per student" withheld from its per-pupil allocation.

Frederick Classical also raises a policy argument against the State Board's decision,

contending that permitting the Local Board to withhold funds from its per-pupil allocation

to which it is entitled under ED § 9-109 and State Board precedent, while providing no

service in exchange, results in "retaining that money instead in the school system budget,

inevitably redistributing and spending those funds" on students in traditional public

schools. Frederick Classical insists that this amounts to it "being compelled to subsidize

the rest of the [local school] system at great cost to Frederick Classical and little benefit to

the rest of the system."

In response, the Local Board claims that the State Board "appropriately determined

that the funding formula used by the [Local] Board here, which did not include a share of

its transportation budget, does not violate provisions of Maryland law regarding

'commensurate funding' for charter schools and was consistent with *City Neighbors*." The

Local Board contends that in *City Neighbors*, this Court recognized that certain local school

board funds, including transportation, "are dependent upon whether or not [ ] students [at

49

the charter school] 'are eligible' for such services." Apparently regarding students' 'eligibility' for a service as synonymous with students 'actually receiving' that service, the Local Board asserts that because the students at Frederick Classical were not actually receiving transportation services from the school, Frederick Classical was "not entitled to funding."

The Local Board also claims that its funding allocation was "based on the same approach and formula" that was approved in *Monocacy*. It further insists that the *Monocacy* approach and formula applies broadly and "was not based on any agreement by the charter school there that it would waive, forfeit, or forego transportation funding." Finally, the Local Board disputes Frederick Classical's policy argument that the exclusion of transportation funds from its funding allocation resulted in Frederick Classical subsidizing the costs of transportation services to students in traditional public schools. As to that point, the Local Board reiterates the same argument that it raised before the Court of Special Appeals, that its transportation budget represented a fixed "total cost to actually transport students living in [ ] transportable areas and for special education students needing specialized transportation," a population which, aside from certain special education students, did not include any charter school students "who are not entitled to transportation." The Local Board insists that "it would be an absolute windfall" for Frederick Classical to receive a proportionate share of those costs.

In its Reply Brief, Frederick Classical asserts that, as to the Local Board's position that Frederick Classical students are ineligible for transportation services, the State Board in the *City Neighbors* declaratory rulings clearly stated that per-pupil allocations are only

reduced when students are ineligible for those funds based upon explicit restrictions in state or federal law. Here, Frederick Classical asserts, there are no such restrictions on transportation funds. Frederick Classical also contends that, in addition to the reasons it provided in its initial brief, the exclusion of transportation funds in *Monocacy* does not control the outcome of this case because that exclusion was based on a contractual agreement between the charter school and the local county board that the State Board interpreted to mean that the charter school had agreed to "forego transportation funds." Finally, relying upon this Court's holding in *CBS, Inc. v. Comptroller of the Treasury*, 319 Md. 687 (1990), Frederick Classical maintains that "to the extent that the [State Board's decision] represents a change in the State Board's interpretation of the statute, it could not be adopted through a contested case proceeding at all; it would have required there first to be a rulemaking."

As discussed above, the State Board determined that under ED § 9-109 and its own precedent interpreting that statute, "a charter school is not automatically entitled to funds for services it does not provide." Frederick Classical Charter Sch., Inc., MSBE Op No. 14-21 at 4. Applying that standard to the parties' dispute, the State Board found that "if [Frederick Classical] received funds for services [that] it did not provide, it would be receiving more than its commensurate share of county funds." *Id.* The State Board therefore affirmed the Local Board's exclusion of transportation funds from the per-pupil

allocation, concluding that it was "not contrary to state law" and was "consistent with [its] past rulings."[20] *Id.* at 5.

The State Board's conclusion that a charter school is not entitled to funds for services it does not provide was not squarely addressed in our *City Neighbors* opinion. The *City Neighbors* declaratory rulings that we reviewed in that opinion did set forth a formula for local school boards to use to calculate a charter school's per-pupil allocation that included transportation services and funding, but we did not discuss the State Board's treatment of transportation in our holding.[21] Nor did we address whether the charter schools involved in that case were providing transportation services to their students.

Nonetheless, just as in *City Neighbors*, in this appeal we must evaluate a State Board decision that involves ED § 9-109 and the "commensurate" funding requirement. In that opinion, we determined that the "commensurate" funding requirement in ED § 9-109 is

---

[20] The State Board also affirmed the Local Board's per-pupil allocation on the separate basis that Frederick Classical had agreed not to receive transportation funds in its charter agreement. That separate basis for the State Board's ruling is analyzed in Part III.C of this opinion, *infra*.

[21] The Court of Special Appeals construed our decision in *City Neighbors*, 400 Md. 324, as standing for the proposition that a county school board could not require "the *mandatory* exclusion of transportation funds from [a] per[-]pupil allocation amount," but not an "affirmative holding that transportation funds can never be excluded from the funds disbursed to a charter school." *Frederick Classical Charter School, Inc.*, 227 Md. App at 455-56 (emphasis in original). However, the only references to transportation in our *City Neighbors* decision were a brief summary of the State Board's treatment of transportation in its declaratory rulings, and a legislative report and State Board guideline discussing transportation in funding of charter schools. 400 Md. at 336, 349-50. The report and guideline to which we cited in *City Neighbors* both predated the adoption of the Charter Schools Program statute and ED § 9-109 by several years and were not directly relevant to our holdings.

"patently ambiguous."  400 Md. at 347.  Consequently, we held that we must give "heavy deference" to the State Board's interpretation of that statute, and defer to its interpretation unless it is "patently wrong."  *Id.* at 347-48.  We also stated that "[t]o the extent that we desire to look further, we would apply the most relevant rules of statutory construction to determine the legislative intent, and, in that regard, may consider legislative history and the statutory purpose."  *Id.* at 348.

Applying a similar analytical approach to ascertain whether the State Board's legal determination that Frederick Classical was not entitled to transportation funding when it did not provide transportation was legally correct, we shall assess whether those determinations are consistent with the State Board's own interpretation of ED § 9-109, set forth in the *City Neighbors* declaratory rulings and *Monocacy*.  And, "[t]o the extent that we desire to look further," we shall consider whether the State Board's legal determinations in those opinions regarding transportation funds are consistent with the legislative intent behind ED § 9-109, as extensively described by this Court in *City Neighbors*, 400 Md. 324.

*Transportation in the City Neighbors Declaratory Rulings*

In the *City Neighbors* declaratory rulings, the State Board provided its first broadly applicable interpretation of ED § 9-109.  That statute provides,

> A county board shall disburse to a public charter school an amount of county, State, and federal money for elementary, middle, and secondary students that is commensurate with the amount disbursed to other public schools in the local jurisdiction.

The State Board interpreted that statute to mean "that a public charter school 'receive federal, State, and local funding in an amount **proportionate** to the amount of funds

**expended** for elementary, middle, and secondary level students in the other public schools in the same system.'" 400 Md. at 336 (emphasis added).

Most significantly to this appeal, the State Board specified in the *City Neighbors* declaratory rulings that "commensurate" funding provided to a charter school must include "'funding for services **for which students in the public charter schools are eligible** such as free and reduced price meals, pre-kindergarten, special education, English-language learners, Perkins, Title I, **and transportation**.'" *Id.* (emphasis added). Thus, the State Board plainly determined that a proportional share of the funding budgeted by a local school board for those specified services, including transportation, must be included in the funds provided to a charter school to the extent that students at the charter school are "eligible" to receive those services. *See City Neighbors*, 400 Md. at 356 (noting that the State Board had concluded in the *City Neighbors* declaratory rulings that the "commensurate" funding provided to a charter school "must include Title I and special education funds, to the extent that students in the charter schools are eligible for those services," and holding that the State Board was "clearly entitled" to draw that conclusion under its authority to "explain the true intent and meaning" of ED § 9-109).

The Local Board contends that by stating in the *City Neighbors* declaratory rulings that charter school students must be "eligible" for a service in order for the charter school to be entitled to a proportionate per-pupil share of the funds expended for that service, the State Board meant that a charter school must actually provide the same services budgeted for and provided by a local school board in order to be entitled to a proportionate per-pupil

share of funding for that service. But that interpretation is entirely contrary to the overall approach the State Board endorsed in the *City Neighbors* declaratory rulings.

In the *City Neighbors* declaratory rulings, the State Board specified that the commensurate funding was to be calculated on a per-pupil basis. *Id.* at 336-37. That calculation begins with a local school system's total annual operating budget, including all federal, State, and local funding, except for appropriations for adult education and debt servicing. *Id.* That figure is then divided by enrollment to reach an average per-pupil figure. *Id.* at 337. A local county board may then deduct two percent from the per-pupil figure to account for central office administrative costs. *Id.* Finally, the average per-pupil figure is multiplied "by the student enrollment of the charter school to determine the total funding amount for the charter school." *Id.*

Thus, the State Board explicitly rejected a "mirror image" approach under which a charter school would have to design its budget to mirror each category of funding employed by the local county board, and then receive a proportionate share of funding or services in that category. *See City Neighbors*, MSBE Op. No. 05-17, Ex. 2b (noting that "the calculation of average cost does not mean that the funding mix of each fund source to the [local school board] must be duplicated at the Charter School level," and that "there is reason neither to assume nor expect that the [local school board] would create a mirror image of itself within the Charter School"). Instead, a charter school receives a lump sum cash disbursement that reflects the average costs expended on students in traditional public schools, multiplied by the enrollment of the charter school. The approach affords charter

55

schools a high degree of flexibility in how they choose to spend that lump sum to provide their preferred educational programs and services.

Furthermore, in contrast to the Local Board's position, the *City Neighbors* declaratory rulings clearly indicate that the State Board had a much narrower intent in stating that students at a charter school must be "eligible" for transportation or one of the other specified services in order for the charter school to be entitled to a proportional, per-pupil share of funds budgeted for that service. The State Board noted that charter schools "would have to make budgetary allocations in light of the students' **eligibility requirements**" under federal or state law "and in doing so must comply with all **applicable Federal and State requirements**." *City Neighbors*, 400 Md. at 337 (emphasis added). Specifically, the State Board "recognized the prospect that not every student attending a charter school would be entitled to Title I or special education funds or services and, indeed, that in some charter schools none of the students might be eligible, that funding restrictions applicable to those programs would require the public charter schools to adjust their budgets '**to be in compliance with programmatic laws and regulations**.'" *Id.* at 338 (emphasis added). An attached guidance document further specified that "[t]he actual funding sources that would be provided to [a charter] school would be dependent upon the specific school's **eligibility for those restricted funds**." *City Neighbors*, MSBE Op. No. 05-17, Ex. 2b (emphasis added).

The *City Neighbors* declaratory rulings thus merely acknowledged that some specific services provided by local school boards, particularly Title I and special education services, may have detailed eligibility requirements under federal or state law or

regulations. For funding associated with those services, the State Board determined that a charter school must meet those federal or state eligibility requirements, or else forfeit the proportional share of the local school board's spending on those services to which it would otherwise be entitled under the per-pupil allocation formula.

Although not specifically detailed in the *City Neighbors* declaratory rulings, there are no such detailed federal or state eligibility requirements or programmatic restrictions that apply to either local school boards or individual schools with respect to student transportation funds. Funding for public school transportation in Maryland is paid for through a combination of state and local county government funding. Section 5-205 of the Education Article provides that "[t]he State shall distribute grants as provided under this section to the [local school] boards to provide transportation services for public school students and disabled children for whom transportation is to be provided under § 8-410 of [the Education Article]." The statute provides a "base grant" amount and a statutory formula that allows for an increase in the base amount within certain limits each year. ED § 5-205(b)-(c). The statute also includes a separate disabled student transportation grant. ED § 5-205(d). Local county governments may also provide additional transportation funding.[22]

For the funding that it provides, the General Assembly imposes certain purely budgetary restrictions on local school boards. Section 5-205(a) also requires that

---

[22] For example, in Fiscal Year 2014, the "base grant" funding for Frederick County under ED § 5-205 was $6,620,447, but the total expenditure under the "Transportation" category in the Local Board's budget was $20,676,409.

"[a]ppropriations for student transportation shall be budgeted in a separate budget category," and that "[a] [local school] board may not transfer State revenues from the student transportation category to any other category as a result of this section." The funds provided by the State also may not "be paid to or claimed by any subdivision," or "reverted to any subdivision." *Id.* However, the General Assembly has not imposed detailed programmatic restrictions on how those funds must be used.

Indeed, with the exception of certain disabled students, local school boards are not required by law to provide transportation services to individual public school students. Section 4-120(b) of the Education Article provides that "each [local school] board **shall arrange** for the transportation of students to and from consolidated schools" (emphasis added).[23] However, requiring a local school board to "arrange" for transportation of students is distinct from requiring that a local school board "provide" such transportation. A local school board may "arrange" for transportation to be provided by others, such as a student's parents, without needing to directly provide transportation services through a school bus service or other means. The fact that the General Assembly has recognized this distinction is easily seen in § 8-410(a) of the Education Article, which provides that "[e]ach local school system **shall provide or arrange** for the transportation during the regular school year of each child with a disability who is in a placement approved in conformity with this subtitle and applicable regulations of the State Board" (emphasis added). As a

___

[23] In Prince George's County, this authority is vested in the Chief Executive Officer. ED § 4-120(c).

local school board must either provide or arrange transportation for qualified special education students, it must provide transportation if an arrangement is not reached with the child's parents or others that they will transport the child.

Other statutes also reinforce that a local school board is not required by state law to provide transportation to any particular public school student, aside from those disabled students covered under ED § 8-410(a). Section 7-801(b)(1) of the Education Article states that "[a]t its own expense, a county governing body **may** provide transportation for public school students in addition to the transportation provided by the State" (emphasis added). And, § 7-805(a) of the Education Article states that "[a] school bus **may** be used to transport any student who lives within the mileage limit, if a mileage limit has been established by a local board of education" (emphasis added).

Local school board policies regarding transportation similarly reflect that they are not required to provide transportation to and from school for any given student. For example, the Local Board's "transportation of students" policy states that transportation is not the responsibility of the Local Board, but rather "a partnership between the home and the school." Board of Education of Frederick County, Maryland, Policy 441.1(A). Furthermore, the policy provides that, generally, "elementary students are not eligible for school bus transportation to school unless the most practical, direct walking route is longer than 1¼ miles," and "middle and high school students are not eligible for school bus transportation to school unless the most practical, direct walking route is longer than 1¾ miles." *Id.* at 441.2(A)-(B).

As transportation funding is not restricted under state law, under the formula set forth in the *City Neighbors* declaratory rulings, funds for transportation services must be included in the formula for calculating a charter school's per-pupil funding allocation. And because there are no eligibility requirements in federal or state law that mandate that students attending public schools must receive those services, aside from the requirement that qualified special education students must be provided with transportation, a charter school does not have to provide transportation services or take any other actions in order to qualify for its proportional share of the average per-pupil transportation funding spent on its general student population (*i.e.*, for those students other than disabled students who qualify for transportation under ED § 8-410).

The *City Neighbors* declaratory rulings did state one important exception under which transportation services could nonetheless be deducted from a charter school's per-pupil funding allocation. The State Board determined that "[f]or the special services that must be provided to eligible students, the charter school could elect either to provide the services directly or have them provided by the school system, but if it opted for the latter, it would be required to reimburse the school system for the proportionate cost of those services." *City Neighbors*, 400 Md. at 337-38. As noted previously, transportation is not a service that must be provided to general education students. But, for disabled students who are entitled to transportation pursuant to ED § 8-410, a charter school must elect to actually provide transportation services to disabled students in order to receive its proportional share of county funding for the transportation of disabled students. In

contrast, if the charter school elects to have transportation for special education students provided by the local school board, it must reimburse the cost of those services.

Similarly, the State Board also determined that a charter school would be required to reimburse a local county board for "'regular services and supplies that the charter school requests the local school system to provide.'" *Id.* at 338. Thus, if a charter school **requests** that the local board provide transportation to all of its students, and the local school board agrees to provide that service, the charter school must reimburse transportation funding to the local school board.

The "guidance documents" attached to the *City Neighbors* declaratory rulings provide further support that, under the approach endorsed by the State Board in that case, a charter school is generally entitled to transportation funds unless it requests that a local school board provide transportation. One of those documents, Exhibit 4, "Charter Schools and Special Education," states the following regarding transportation:

> As a part of the contract agreement between the [local school system] and Charter School, transportation should be addressed for all students including students with disabilities attending the charter schools. This may include the Charter School returning to the [local school system] the portion of funds provided for transportation or the Charter School providing the transportation service for the student. . . .

*City Neighbors*, MSBE Op. No. 05-17, ex. 4. The exhibit reflects that the State Board expected that local school boards and charter schools would state how transportation services would be provided to children attending a charter school in the school's charter agreement. If a local school board agreed to a charter school's request that it provide transportation, and that agreement was memorialized in the charter agreement, the charter

61

would be required to "return[ ] to the [local school system] the portion of funds." Alternatively, the charter agreement could contain an agreement that the charter school would provide transportation, in which case—**by operation of the charter agreement** and not by state law—the charter school would be required to provide those services.

In summary, pursuant to the precedent stated in the *City Neighbors* declaratory rulings, when calculating a charter school's per-pupil allocation of commensurate funds, a local school board generally must include in that calculation funds budgeted for any of the services expressly identified in the declaratory rulings—including funds for transportation services. However, a local school board is not required to include funds for services that have detailed eligibility requirements under state and federal law when the charter school does not meet those eligibility requirements. For transportation, there are no such eligibility requirements for general education students, and a local school board must therefore include the funds budgeted for that service when calculating a charter school's per-pupil allocation, regardless of whether a charter school provides transportation services to its general student population. For special education students, a charter school must actually provide transportation for special education students in order to qualify for a proportional share of the local school board budget for those services. Finally, a charter school may elect, but is not required, to request that a local school board provide transportation for some or all of its students. If a local school board agrees to provide transportation, the charter school must reimburse the local school board for the cost of those services.

*The State Board's Decision in the Instant Case Is Not Consistent with the City Neighbors Declaratory Rulings*

The State Board's decision in this appeal is plainly contrary to its own precedent in the *City Neighbors* declaratory rulings. In this case, the State Board determined that "a charter school is not automatically entitled to funds for services it does not provide" and that "if [Frederick Classical] received funds for services [that] it did not provide, it would be receiving more than its commensurate share of county funds." However, under the *City Neighbors* declaratory rulings, a charter school *is* automatically entitled to a proportional share of *all* of the federal, state, and local funds that the local school board expends on elementary, middle, and secondary students, including funding for transportation and the other specified services, unless the charter school fails to meet specific eligibility requirements for a service or elects to have the local board provide the service.[24]

Under state and federal law, there are no specific eligibility requirements that require Frederick Classical to provide transportation services to its students, aside from special education students. And, Frederick Classical had not requested that the Local Board provide transportation to general education students. Thus, Frederick Classical does not need to actually provide transportation in order to be entitled to a proportional share of transportation funding budgeted for the general student population in its per-pupil allocation. Consequently, under the *City Neighbors* declaratory rulings, Frederick

---

[24] That proportional share is, however, subject to a two percent reduction for central administrative functions and does not include funding for adult education or debt servicing. *City Neighbors*, 400 Md. at 337.

Classical was entitled to transportation funds, and the State Board erred in affirming the Local Board's decision denying those funds.

Nor does it appear that the exclusion of transportation funds while calculating Frederick Classical's per-pupil allocation was the only substantial deviation from the *City Neighbors* declaratory rulings formula by the Local Board. The Local Board's chart describing its calculation of the 2014 Fiscal Year allocation to Frederick Classical shows that it withheld $1655.64 in per-pupil funds and provided that amount in "in-kind" services. The Local Board listed several services as "in-kind services" that a charter school may well desire that a local school board provide, including: special education services; non-public placement for disabled students; a pupil personnel worker; the CASS program; a school therapist; student health, including health room technicians and workers; and, food services. However, it is not clear from the record if Frederick Classical did in fact desire any of those services, or whether the Local Board intended to actually provide any of those services to Frederick Classical. And, the Local Board listed several services as "in-kind services" that appear to be purely administrative costs for the Local Board with no direct benefit to Frederick Classical, including the costs of employing a superintendent, a deputy superintendent, a Chief Operating Officer, other mid-level management, and the Local Board members; and the costs for the Human Resources, Legal, Communication Services, Budget, Finance, Purchasing, Technology Services, and Curriculum Instruction, Assessment & Innovation departments.

But, as the State Board made explicitly clear in the *City Neighbors* declaratory rulings, all such "in-kind services" should be provided only if explicitly requested by a

charter school. And, the overall deduction for all central administrative costs should be capped at two percent of a charter school's funding allocation. As we recognized in our own *City Neighbors* opinion, those limitations were both critical to the formula's approach of ensuring that a charter school was provided with a proportional share of funding in the form it could actually use to implement its programs—cash. In *City Neighbors*, we stated that in-kind services should not be "forced on [ ] charter schools at the whim of [local school] boards." 400 Md. at 356. And, as to the two percent cap, we similarly stated that "the [State] Board was simply unwilling to allow the [local school] boards to deduct amounts for the entire range of administrative expenses they choose to incur." *Id.* We further noted that implicit in the two percent cap, the State Board had determined that "charter schools, being somewhat autonomous, would not need and should not be subject to the full range of control exercised by the central administration over the regular public schools, and that they therefore should not be charged with a share of that total expense." *Id.* at 356-57.

Frederick Classical did not raise a dispute regarding the provision of in-kind services in its appeal to the State Board from the Local Board's funding allocation, and in-kind services were tangential to the State Board's decision below. Consequently, the issue whether the in-kind services in Frederick Classical's funding allocation were proper under the *City Neighbors* declaratory rulings is not before us in this appeal. However, to the extent that the State Board chooses to adhere to the formula and approach set forth in its *City Neighbors* declaratory rulings in the future, it should closely review local school board allocations to charter schools to determine whether withholdings for "in-kind" services are

solely for those services that the charter school has, in fact, requested that the local school board provide and that the local school board is in fact providing those services to the charter school. A local school board should not be permitted to flout the standards set by the State Board as to how funding is calculated for a charter school, and lower that school's per-pupil allocation, simply by declaring that it has "provided" a charter school with "services" that provide no direct benefit to students and that the charter school neither needs nor desires.

> *The State Board's Decision in the Instant Case Is Not Consistent with Its Ruling in Monocacy*

We must also consider whether the State Board changed its position on the funding of public charter schools in *Monocacy*, and if that case supports the State Board's decision to reject Frederick Classical's appeal. In *Monocacy*, the State Board considered whether a formula used by the Frederick County Board of Education, the same Local Board in this case, to calculate the per-pupil allocation for a charter school, MMCI, was consistent with ED § 9-109 and the commensurate funding requirement. The Local Board's formula had three steps:

> First, [the Local Board] subtracted from the total budget all restricted budget amounts targeted for specific programs and services. That resulted in the "unrestricted budget." Second, it adjusted the total unrestricted budget proportionally [by] subtracting the value of the services it provided in-kind and directly to MMCI. It divided that amount by the number of students enrolled. . . . Finally, the local board would add on to that per[-]pupil amount any restricted funds for which charter school or its students were eligible.

*Monocacy*, MSBE Op. No. 06-17 at 3. In the instant appeal, the Local Board applied the same three-step approach to calculate Frederick Classical's 2014 Fiscal year per-pupil allocation. *See supra* Part I, 18-21.

However, the State Board in *Monocacy* did not endorse or approve the Local Board's formula. Indeed, in *Monocacy* the State Board explicitly stated that the Local Board's formula was "not consistent with the State Board's formula" set forth in its *City Neighbors* declaratory rulings. *Id.* at 4. And, the State Board reaffirmed the importance of the *City Neighbors* formula, explaining that it "results in a bottom line amount of money that this Board considers [to be] proportionate/commensurate funding." *Id.* at 5. Although the State Board did not entirely rule out a local school board's use of a different approach, it stated that if a local school board uses a different formula it must result in the same "bottom line amount of money" so that the State Board could "conclude that the school system was providing proportionate/commensurate funds to the charter school." *Id.*

In *Monocacy*, the State Board began its analysis by calculating MMCI's per-pupil allocation using the same approach as the *City Neighbors* declaratory rulings. After it credited the Local Board for the provision of in-kind services to MMCI, and subtracted out funds to which MMCI was not entitled,[25] it determined that the Local Board's

---

[25] In *Monocacy*, the State Board did not conduct a detailed examination as to whether MMCI was, in fact, entitled to any of the funds that the Local Board had determined were "restricted" funds. It is not clear if MMCI raised that issue before the State Board. In any event, the State Board appears to have presumed that MMCI was not entitled to any of the "restricted" funds and therefore deducted a proportional share of those funds from its own figure, amounting to $500. *Monocacy*, MSBE Op 06-17 at 11. But the State Board also made a point of stating that in addition to the $12 per pupil, the Local Board would also have to provide MMCI with "any restricted funds to which MMCI is

allocation was $12 less than the correct figure reached under its own formula. Therefore, it directed that "[the Local Board] must provide an additional $12.00 per pupil to MMCI" in order to ensure that MMCI received commensurate funding. *Id.* at 12. Thus, *Monocacy* both applied and, in effect, fully upheld the formula adopted in the *City Neighbors* declaratory rulings, permitting a local school board to use its own approach only so long as that local school board ultimately adjusted its own per-pupil allocation figure to be dollar-for-dollar exactly the same as that reached under the State Board formula.[26]

Although *Monocacy* was consistent with the State Board's precedent in the *City Neighbors* declaratory rulings—under which, as we have explained, transportation funding for general education students must be included in a charter school's funding allocation— the State Board and Court of Special Appeals below, and the Local Board on appeal, have all misinterpreted *Monocacy* as standing for a broader proposition that a local school board may exclude transportation services from a charter school's allocation.

---

entitled." *Id.* at 12. The State Board in *Monocacy* thus implicitly recognized that a local school board may only exclude funds from a per-pupil allocation if the charter school is not entitled to those funds under State Board precedent interpreting ED § 9-109. In contrast, the *Monocacy* decision does not imply that a charter school is not entitled to certain funds merely because a local school board has labeled those funds as "restricted."

[26] Given the State Board's decision in *Monocacy*, it is unclear to this Court why the Local Board would continue to spend the bureaucratic time and effort to calculate a charter school's per-pupil allocation under its own formula, only to ultimately be required to spend additional time and effort to make a separate calculation using the State Board approach and adjust its own sums to reflect the State Board's preferred method. However, we must admit that such an approach, albeit convoluted and seemingly unnecessary, is consistent with the State Board's decision in *Monocacy*.

In denying relief to Frederick Classical in its initial appeal from the Local Board, the State Board indicated that it viewed *Monocacy* as supporting its determination, stating that "[a]s we noted in *Monocacy*, if [a charter school] received funds for services it did not provide, it would be receiving more than its commensurate share of county funds." *Frederick Classical*, MSBE Op. No. 14-21 at 4. However, Frederick Classical is correct that *Monocacy* does not support that statement. MMCI, the charter school at issue in *Monocacy*, agreed in its charter agreement that it would undertake the responsibility of providing transportation to all of its students, except special education students or those who live along an established bus route. *Monocacy*, MSBE Op. No. 06-17 at 8. Thus, the issue of whether it was appropriate to exclude transportation funding to a charter school that did **not** provide transportation or other services was not raised in *Monocacy*, and the State Board did not discuss that issue.

The Court of Special Appeals held that the State Board's statement that "if [a charter school] received funds for services it did not provide, it would be receiving more than its commensurate share of county funds" was supported by *Monocacy*, citing to a statement in *Monocacy* that "if MMCI were entitled to the full per[-]pupil amount" that it had claimed, "MMCI would receive an amount greater than an 'equal' amount of funds." *Frederick Classical Charter School, Inc.*, 227 Md. App. at 457 (quoting *Monocacy*, MSBE Op. No. 06-17 at 9). However, in the section of *Monocacy* relied upon by the Court of Special Appeals, the State Board was discussing MMCI's contention that it was entitled to a per-pupil allocation calculated by dividing the Local Board's total operating budget by total enrollment, with no exclusions or deductions of any kind. *Monocacy*, MSBE Op. No.

69

06-17 at 9. But, as the State Board noted in that case, MMCI was in fact receiving certain in-kind services from the State Board. *Id.*

Thus, in the statement relied upon by the intermediate appellate court, the State Board in *Monocacy* was merely clarifying that if a charter school received **both** funding that a local school board allocated to a certain service **and** the service itself for free from the local school board, it would be receiving more than a commensurate or roughly equal share of funds. In such circumstances, the State Board in *Monocacy* determined that "if MMCI accepts in-kind services from [the Local Board] it would have to buy back those services." *Id.* That determination, which is entirely consistent with the State Board's precedent in the *City Neighbors* declaratory rulings, does not support the State Board's ruling in the instant case, as Frederick Classical was not seeking or being offered any transportation services for its general student population from the Local Board.

Finally, the Local Board suggests that *Monocacy* supports the State Board's decision to affirm its exclusion of transportation funding from Frederick Classical's per-pupil allocation because the State Board in *Monocacy* affirmed its exclusion of $420 in per-pupil transportation funding when calculating MMCI's per-pupil allocation. The Local Board views the *Monocacy* ruling as a broadly applicable one that transportation funds may be excluded when calculating a charter school's per-pupil allocation, and contends that it "was not based on any agreement by [MMCI] that it would waive, forfeit, or forego transportation funding."

But, the State Board was clear that its exclusion of transportation funds in *Monocacy* was based solely on a clause in the charter agreement between MMCI and the Local Board,

70

which stated that "transportation shall be the responsibility of MMCI except for students who live along [an] established [bus] route and for special education students." *Id.* at 8. The State Board interpreted that provision to mean that "MMCI essentially has agreed that it is not entitled to the transportation dollars contained in [the Local Board's] Total Operating Budget."[27] *Id.* at 9. Thus, contrary to the Local Board's view, the State Board's ruling in *Monocacy* that transportation funds may be excluded **was** based on a contractual agreement, which the State Board interpreted to mean that the charter school had agreed to forego transportation funds.

Thus, *Monocacy* stands for, at most, the proposition that a charter agreement between a charter school and a local school board may operate to waive or forego transportation funds to which the charter school is otherwise entitled. We address whether the State Board was correct to affirm the Local Board's exclusion of transportation funds based on language in Frederick Classical's charter agreement that it regarded as similar to

---

[27] In *Monocacy*, the State Board did not expressly state *why* MMCI would have agreed to forego transportation funds, when it could have used those funds to pay for the transportation that it was providing to students. But, the State Board did note that the charter agreement was entered into on January 14, 2015, which was prior to the issuance of its *City Neighbors* declaratory rulings. *Monocacy*, MSBE Op. 06-17 at 8. And, the State Board referred to the transportation provision in MMCI's charter as a "*pre-existing agreement* that MMCI would absorb the cost of transportation," presumably meaning that the agreement pre-dated the *City Neighbors* declaratory rulings. *Id.* at 10 (emphasis added). Until the issuance of the *City Neighbors* declaratory rulings, charter schools and local boards were entirely in the dark as to what was meant by the "commensurate" funds provision in ED § 9-109. Consequently, MMCI may well have agreed to provide transportation solely out of its own resources as part of a negotiation with the Local Board that took place prior to the existence of the formula and guidance of the *City Neighbors* declaratory rulings.

71

that in *Monocacy* in the next section of this opinion. *See infra*, Part II.C. However, *Monocacy* clearly does not stand for the broader proposition that a local school board may always exclude transportation funding or may exclude funding when a charter school does not provide transportation services. Therefore, it does not support the State Board's conclusion that Frederick Classical is not entitled to transportation funding when it did not provide transportation services.

### *The State Board's Decision in the Instant Case Is Not Consistent with the Legislative Intent of ED § 9-109 and the Charter School Program*

The State Board's ruling in the instant case that Frederick Classical was not entitled to transportation funds when it did not provide transportation is thus plainly contrary to its own precedent in the *City Neighbors* declaratory rulings and *Monocacy*. Nevertheless, on its face, the State Board's ruling has a certain intuitive appeal; it might seem unfair that Frederick Classical should receive transportation funds without needing to provide transportation services to its students. That is certainly the position of the Local Board, which asserts that permitting Frederick Classical to receive transportation funds would result in an unearned "absolute windfall" for the school. Therefore, we shall "look further" to determine whether that ruling is consistent with ED § 9-109 and the overall Charter School Program statute, in light of our explanation in *City Neighbors* of the legislative history and the statutory purpose of those provisions. 400 Md. at 348-54.

As we stated in our *City Neighbors* decision, "[c]harter schools are in the nature of **semi-autonomous** public schools that operate under a contract with a State or local school board." 400 Md. at 328 (emphasis added). "The principal objective" of the "parents,

educators, community groups, [and] private entities" who desired to create charter schools "was to develop and implement innovative and more effective educational programs." 400 Md. at 329. Similarly, § 9-101 of the Education Article states that "[t]he general purpose of the [Charter School] Program is to establish an alternative means within the existing public school system in order to provide innovative learning opportunities and creative educational approaches to improve the education of students." In order to accomplish that aim, we explained in *City Neighbors* that charter school advocates "**needed and demanded freedom from some of the structural, operational, fiscal, and pedagogical controls** that governed the traditional public school system." 400 Md. at 329 (emphasis added).

Thus, the statutory purpose of the Charter School Program was to establish and fund charter schools as an "alternative means" of providing innovative, creative and more effective teaching programs "to improve the education of students." *Id.* And, as we recognized in *City Neighbors*, charter schools are "semi-autonomous" and must operate with a certain degree of independence and flexibility in order to meet that purpose, including some freedom from the close supervision that local school boards may employ over how traditional public schools budget and spend their funding. *Id.* at 328.

The approach taken by the State Board in the *City Neighbors* declaratory rulings, under which a charter school is entitled to funding without strings attached unless there are specific eligibility requirements in state or federal law that it must meet to secure that funding, enhances the flexibility that charter schools need in order to accomplish their statutory purpose. A charter school may well elect to use funding that a local school board devotes to transportation, or other specific services, to fund an additional teacher in a

73

specialty area, or provide a new classroom program, or offer more afterschool services, or in a variety of other innovative ways that could improve the education of charter school students. And, parents who choose to send their children to a charter school may well prefer that the school devote more funding to those other services that benefit their children, leaving transportation of children to and from the school to the parents.

In contrast, the conclusion of the State Board in the instant case—that Frederick Classical is not entitled to a commensurate share of transportation funds when it does not provide transportation services—restricts Frederick Classical's flexibility and freedom to decide how to best use its funds to provide innovative services that the school believes will improve the education of its students. We note that Frederick Classical may yet seek to use those funds to provide transportation—its charter agreement provides that "[i]f [Frederick Classical] subsequently determines to provide transportation during the term of this Charter, it may contract with an approved provider for transportation services within provisions allowable under the negotiated agreement." Or, it may determine that there is a better use of those funds under its chosen educational program.

Turning to the statute and its legislative history, ED § 9-109(a) states that "[a] county board shall disburse to a public charter school an amount of county, State, and federal money for elementary, middle, and secondary students that is commensurate with the amount disbursed to other public schools in the local jurisdiction." In *City Neighbors*, we noted that the statute is "patently ambiguous" and that "the whole comparative framework [ ]—what the disbursement to the public charter schools should be commensurate with—requires interpretation." *Id.* at 347. However, in our detailed

description of the legislative history of that provision,[28] we did not identify any materials indicating a legislative intent that the commensurate funding of a charter school be contingent upon the charter school providing the same services provided by a local school board.[29]  Nor do we find any upon reexamination of the relevant legislative history.

Under the Charter Schools Program statute, charter schools certainly do not have the freedom to **use** public funds entirely without constraint or supervision.  To the contrary, a charter school must "comply with the provisions of law and regulation governing other public schools" unless it obtains a waiver to the contrary from a local school board or the State Board.  ED § 9-106.  Furthermore, a charter school must operate "under the

---

[28] Although significant amendments were made to the Charter School Program in the Public Charter School Improvement Act of 2015, including an amendment to ED § 9-109 that deleted a previously extant subsection (b), the current text of ED § 9-109 was not otherwise altered or amended.  *See* 2015 Md. Laws, ch. 311.  Therefore, our previous description of the legislative history in *City Neighbors* retains its full force for our analysis in this case.

[29] We noted in our discussion of the legislative history in *City Neighbors* that in July 1997 "the State Department of Education [ ] adopted Guidelines for local boards to use when considering charter school applications."  400 Md. at 350.  Those guidelines indicated that a charter school's "per-pupil calculation should include eligible local, state, and federal funds in the calculation[,]" but also that "[o]ther fiscal support such as transportation may be part of the negotiations between the charter requestor and the local education authority."  *Id.* (quoting *Guidelines for Use by Local School Systems in Considering Charter School Applications*, Maryland State Department of Education (July, 1997) at 8).  The Court of Special Appeals in this case determined that the guideline supported the State Board's decision to uphold the withholding of transportation funding from Frederick Classical.  *Frederick Classical Charter Sch., Inc.*, 227 Md. App. at 456.  However, given that the guideline was issued in July 1997—six years prior to the passage of the Charter School Program and ED § 9-109—we do not believe that it sheds any light on the legislative intent behind the commensurate funds requirement.  We discussed the guideline in *City Neighbors* only as part of tracing the background of the push for charter schools in Maryland that ultimately led to the enactment of the Charter Schools Program.

75

supervision of the public chartering authority from which its charter is granted," meaning the local school board, and "in accordance with its charter." ED § 9-102(11). However, we do not find any evidence of a legislative intent that a charter school's **funding** be tied to a requirement that it provide specific services or programs to its students. Therefore, the State Board's conclusion that Frederick Classical is not entitled to a commensurate share of transportation funds when it does not provide transportation is inconsistent with the legislative intent of ED § 9-109.

Seen in light of the statutory purpose and legislative history of the Charter Schools Program, it was not unfair or an "absolute windfall" for Frederick Classical to seek a proportional share of transportation funds with the intent of using those funds to provide other innovative services to its students. Instead, the withholding of transportation funds from Frederick Classical's funding allocation was a windfall for the Local Board. The Local Board did not use any portion of that funding to provide transportation services to Frederick Classical aside from the special education services it was statutorily mandated to provide. Instead, the Local Board's allocation removed $544.26 in funding per student that it would otherwise have had to pay to Frederick Classical, and retained that amount in its budget to be spent in providing transportation to children in traditional public schools.

The Local Board maintains that its transportation budget represents a fixed cost that does not vary to any significant extent depending on the number of students being transported. Therefore, according to the Local Board, it is "not profiting by not including a portion of its transportation budget in the allocation to [Frederick Classical]." Accepting

that position as accurate for the purposes of this appeal,[30] the Local Board has still decided

to use funds withheld from Frederick Classical to pay for transportation services **only to**

**students at traditional public schools**, and for which, under its own policy, charter

students generally "are not eligible."[31]  Thus, the funds withheld from Frederick Classical

are, in fact, subsidizing services for other public school students—even if that subsidy is

devoted to paying for the fixed costs of providing buses, drivers, and gas for the county's

existing school transportation system.

> *The State Board's Discretion to Revisit Its Determinations as to the "Commensurate" Funding Requirement of ED § 9-109 on Remand*

Even under the deferential judicial standard of review for State Board decisions, we

may determine that a decision of the State Board was erroneous and must be reversed if it

was arbitrary and capricious or in contravention of the statute.  *Bd. of Educ. of Talbot Cty.

v. Heister*, 392 Md. 140, 158 n.13 (2006) (noting that a decision of the State Board is not

entitled to judicial deference if, among other situations, "the State Board has contravened

state statute" or "the State Board exercised its power arbitrarily or capriciously" (quoting

*Hurl v. Bd. of Educ. of Howard Cty.*, 107 Md. App. 286, 299 (1995)) (additional citations

and internal quotations marks omitted)).  Here, the State Board acted arbitrarily and

capriciously when it stated that its ruling that Frederick Classical is not entitled to a

---

[30]  We note that the State Board made no factual findings as to this issue.

[31]  As discussed earlier, by statute the Local Board is also required to provide or arrange transportation to all qualified special education students, including those attending charter schools.

commensurate share of transportation funds because it did not provide transportation services was "consistent with [its] prior rulings" because, as we have shown above, that ruling was in fact directly contrary to its own precedent in the *City Neighbors* declaratory rulings and *Monocacy*. *See Bereano v. State Ethics Comm'n*, 403 Md. 716, 755 (2008) (noting that when this Court reviews an administrative action, "we may uphold the agency order only if it is sustainable on the agency's findings and for the reasons stated by the agency" (quoting *Motor Vehicle Admin. v. Mohler*, 318 Md. 219 (1990))); *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (noting that an agency must "display awareness that it *is* changing position" and may not "depart from a prior policy *sub silentio*") (emphasis in original). Therefore, we hold that the State Board's ruling was erroneous and an abuse of its discretion.

However, our holding leaves open whether, on remand from this appeal, the State Board has the discretion to devise a new interpretation or approach to determining a charter school's "commensurate" funding allocation, so long as it openly acknowledges that it is departing from its precedent in the *City Neighbors* declaratory rulings and *Monocacy*. Moreover, we must address Frederick Classical's contention that if the State Board changes its interpretation of ED § 9-109, it must do so through formal, notice-and-comment rulemaking and not through a contested adjudicatory proceeding.

Generally, administrative agencies are afforded "ample latitude to adapt their rules and policies to the demands of changing circumstances." *Montgomery Cty. v. Anastasi*, 77 Md. App. 126, 137 (1988) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983)). However, an administrative agency decision

"may be deemed 'arbitrary or capricious' if it is contrary to or inconsistent with an enabling statute's language or policy goals" or "if it is irrationally inconsistent with previous agency decisions." *Harvey v. Marshall*, 389 Md. 243, 302-303 (2005); *see also Mesbahi v. Md. State Bd. of Physicians*, 201 Md. App. 315, 331-32 (2011) (holding that an administrative agency "was not free to ignore its prior policy statement[ ]" in a prior declaratory ruling that "laser hair removal constitutes the practice of medicine," and concluding that the agency "gave the appropriate weight" to its prior ruling by treating it as "akin to a precedential adjudicatory ruling"); *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1090-91 (D.C. Cir. 2009) (holding that when Federal Aviation Administration precedent "unambiguously require[d] it to defer to its [Administrative Law Judges'] credibility determinations" but the agency had "deviated from that precedent" by refusing to credit such a credibility determination in a particular case, "its decision reversing the [Administrative Law Judge] without overturning his credibility determination [was] arbitrary and capricious"). Thus, when an agency changes a position clearly established in its own prior precedent it "must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Anastasi*, 77 Md. App. at 137 (quoting *Local 32, Am. Fed'n of Gov't Employees, AFL-CIO v. Fed. Labor Relations Auth.*, 774 F.2d 498, 502 (D.C. Cir. 1985)).

Likewise, the general rule is that agencies have discretion to announce new policies or standards in an adjudicatory proceeding. In *Consumer Protection Division Office of Attorney General v. Consumer Public Co.*, we held that agencies "[are] not precluded from announcing new principles in . . . adjudicative proceeding[s] and that the choice between

79

rulemaking and adjudication lies in the first instance within the [agency's] discretion." 304 Md. 731, 753-54 (1985) (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974)).

We have not, however, afforded agencies unlimited discretion to decide whether to employ adjudication or rulemaking. In *CBS Inc. v. Comptroller of the Treasury*, we addressed the State Comptroller's decision to change the method by which it calculated corporate taxes for out-of-state businesses. 319 Md. 687, 688-89 (1990). We held that, under the circumstances of the case, the Comptroller erred by changing its existing methods through adjudication rather than formal rulemaking. We stated that formal rulemaking "adds an aspect of fairness when an agency intends to make a change in existing law or rule . . . produced by prospective operation of a new rule and by the public notice, public hearing, and public comment processes that accompany rulemaking, but that are sometimes absent from administrative adjudication." *Id.* at 695. We therefore held that "[t]he advantages of rulemaking in certain circumstances reinforce the view that this procedure may sometimes be required." *Id.* at 696. Although we did not "attempt to make an all-encompassing statement of what those circumstances may be," we concluded that "when a policy of general application, embodied in or represented by a rule, is changed to a different policy of general application, the change must be accomplished by rulemaking." *Id.*

In *City Neighbors*, we characterized the State Board's declaratory rulings as "specific to three individual cases that happened to involve some common issues relating to the construction of ED § 9-109" as opposed to a rule of widespread application. 400 Md. at 346. Noting that ED § 9-109, "like the charter school movement generally, was a new [statute], not at all free from ambiguity," we held that the State Board "was well within

its discretion to proceed in the manner it did—adjudicating the cases before it and offering 'guidance' to other applicants, rather than proceeding with more formal and binding regulations." *Id.*

In our most recent case to address agency discretion to proceed by adjudication rather than rulemaking, *Maryland Insurance Commissioner v. Century Acceptance Corporation*, we addressed the Maryland Insurance Commissioner's issuance of a "Cease–and–Desist Order to Respondents purporting to prevent them from charging interest on loans to consumers to pay automobile insurance premiums in excess of the statutory maximum." 424 Md. 1, 6 (2011). We upheld the Commissioner's interpretation of the relevant statute, and also held that it was not required to proceed via formal rulemaking to make that interpretation. *Id.* at 30. We noted that although the agency action represented a change in its prior enforcement pattern, "there was no change in existing law or regulation[,]" and the agency action "was not retrospective, instead deciding the facts before it and imposing requirements for prospective activities[.]" *Id.* We held that the agency action was thus dissimilar to that discussed in *CBS,* and that the holding of that case "is confined [ ] to situations where the agency's adjudication changed substantially the application or effect of an existing law or regulation, not to an agency's interpretation of a stand-alone statute." *Id.* at 31.

Based upon our holding in *Century Acceptance*, because we have previously held that the *City Neighbors* declaratory rulings did not state a broad rule of widespread application in our *City Neighbors* opinion, 400 Md. at 345-46, the *CBS* exception requiring an agency to proceed by rulemaking if it changes a broadly applicable rule or regulation

81

does not apply. However, we have also recognized that, in some circumstances, there may be restraints on agency discretion to revise its standards or interpretations of a statute when there is substantial reliance on the agency's settled standard or interpretation and a change would have a detrimental impact.

In *Baltimore Gas & Electric Co. v. Public Service Commission*, we upheld the administrative agency's decision "to proceed by adjudication in interpreting and implementing" a statute in part because the agency's interpretation "does not differ significantly from that originally articulated by the [agency] shortly after the statute's enactment." 305 Md. 145, 169 (1986). But we noted that "[t]his is not a case, therefore, in which materially modified or new standards were applied retroactively to the detriment of a company that had relied upon the Commission's past pronouncements." *Id.* Similarly, in other cases when we have upheld an agency adjudicatory decision we have noted that the agency decision did not "apply new standards retroactively to the detriment of an entity that had relied upon the agency's past pronouncements." *Dept. of Health v. Chimes*, 343 Md. 336, 346 (1996) (affirming the Developmental Disabilities Administration's decision to implement a growth cap to control costs for community-based health care providers through adjudication, when the ruling only applied "to a limited number of providers . . . in a particular year, and in response to a particular budget crisis" and effectuated the policies stating in controlling statute and regulations "but did not change the law"); *Md. Ass'n of Health Maint. Orgs. v. Health Servs. Cost Review Comm'n*, 356 Md. 581, 601-602 (1999) (affirming the Health Services Cost Review Commission's decision to adopt an inflation adjustment system in particular health facilities on a case-by-case basis without

82

formal rulemaking, noting that it did "not represent a change in the policies or standards applied by the Commission," and that it was "not being applied retroactively to the detriment of the regulated hospitals"); *see also F.C.C. v. Fox*, 556 U.S. at 515 (holding that under the federal Administrative Procedure Act, an agency must provide a "detailed justification" when it announces a new policy if "its prior policy has engendered serious reliance interests that must be taken into account").

In the charter school context, it is now more than a decade since the State Board issued its *City Neighbors* declaratory rulings, and the State Board has never adopted a formal rule or regulation of general application interpreting the "commensurate" funding requirement of ED § 9-109. Instead, the State Board has stuck resolutely to the *ad hoc* adjudicatory approach. Consequently, the "guidance and direction" in the *City Neighbors* declaratory rulings, adhered to by the State Board in *Monocacy*, is the **only** interpretation of "commensurate" funding in ED § 9-109 on which local school boards, existing charter schools, and charter school applicants can rely when faced with deciding the funding allocation of a charter school.

The parties' charter agreement here reflects their reliance on the State Board's precedent to determine the correct "commensurate" funding allocation for Frederick Classical. That charter agreement contained a funding provision which, in pertinent part, stated,

> In accordance with ED § 9-109 **and further clarified in corresponding State Board rulings**, the [Local] Board shall disburse to [Frederick Classical] an amount of county, state, and federal money for elementary, middle, and secondary students that is commensurate with the amount disbursed to other public schools in the local jurisdiction.

(emphasis added). This case also demonstrates that even relatively minor adjustments to the *City Neighbors* declaratory rulings, relating to specific services such as transportation, can have major financial impact—here, $135,926.22 for Frederick Classical in its first year, and more in years thereafter.

More broadly, the operators and staff of charter schools and, ultimately, the thousands of Maryland children attending public charter schools, depend on the commensurate funding allocated by local school boards in order to provide the educational programs and services offered at those schools: teacher and staff salaries, facility costs and upkeep, textbooks and other teaching materials, etc. Thus, charter schools and their staff and student population have substantial reliance interests in the current State Board approach to determine a commensurate allocation of funds to their charter school in the *City Neighbors* declaratory rulings. And, any change in that interpretation in an adjudicatory hearing that resulted in less funding to a charter school than it would have been entitled under the *City Neighbors* declaratory rulings formula would result in the new standard "apply[ing] retroactively to the detriment of" that charter school "that had relied upon the [ ] past pronouncements" of the State Board. *Balt. Gas & Elec.*, 305 Md. at 169.

Therefore, we hold that if the State Board elects on remand to depart from its own interpretation of the commensurate funding requirement or the formula and approach for calculating commensurate funding set forth in the *City Neighbors* declaratory rulings, as clarified in our own *City Neighbors* opinion and this opinion, it may do so either through an adjudicatory proceeding or through formal notice-and-comment rulemaking. Of course, any new interpretation of the commensurate funding requirement in ED § 9-109, whether

issued through an adjudicatory process or by rulemaking, must be consistent with the plain language of ED § 9-109 and the Charter School Program statute as a whole, and to the extent where the statutory language is ambiguous, the statutory purpose and legislative history of those statutes as described in this opinion and our prior *City Neighbors* opinion. Furthermore, if the State Board proceeds through an adjudicatory approach, it must offer a rational explanation for such a change in its written decision. That rational explanation must include how its new interpretation or approach is in keeping with the plain language and, where ambiguous, the legislative history and statutory purpose of ED § 9-109 and the Charter Schools Program statute as a whole, and account for the substantial reliance interests of charter school operators, staff and students, prospective charter school applicants, and local school boards.

### C. The State Board's Ruling That Frederick Classical Was Not Entitled to the Inclusion of Transportation Funds in Its Per-Pupil Allocation Because of Its Interpretation of Language in Frederick Classical's Charter Agreement as Meaning That Frederick Classical Had Agreed That It Was Not Entitled to Transportation Funds

The charter agreement between Frederick Classical and the Local Board contains two provisions relevant to transportation and transportation funding—a funding provision and a transportation provision. The funding provision of the charter agreement states, in pertinent part:

> In accordance with ED § 9-109 and further clarified in corresponding State Board rulings, the [Local] Board shall disburse to [Frederick Classical] an amount of county, state, and federal money for elementary, middle, and secondary students that is commensurate with the amount disbursed to other public schools in the local jurisdiction. [Frederick Classical] may seek and receive other funds through local, state or federal government sources and/or

85

from private sources without a reduction in its annual commensurate allocation.

The student transportation provision states:

Transportation shall be the responsibility of [Frederick Classical] families with the following exceptions:

1. Students who live along an established bus route that passes the School facility; and
2. Special education students with transportation on their [Individualized Education Plans].

If [Frederick Classical] subsequently determines to provide transportation during the term of this Charter, it may contract with an approved provider for transportation services within provisions allowable under the negotiated agreement.

The State Board made two interpretations from those provisions. First, it concluded that "a plain reading of the Charter language indicates that [Frederick Classical] is not responsible for providing transportation." *Frederick Classical Charter Sch., Inc.*, MSBE Op. No. 14-21 at 4. Second, it determined that the provisions meant that Frederick Classical agreed that it is not entitled to transportation funds. *Id.* at 5. In support of its second interpretation, the State Board referenced its decision in *Monocacy* that because the charter school in that case, MMCI, had agreed in its charter agreement to provide transportation to its students, with certain exceptions, "the cost of transportation services per[-]pupil should be deducted from [the State' Board's "bottom line" per-pupil figure] because MMCI essentially has agreed that it is not entitled to the transportation dollars contained in [the Local Board's] Total Operating Budget." *Monocacy*, MSBE Op. No. 06-17 at 9. Here, the State Board determined that "[Frederick Classical] has similarly agreed that it is not entitled to [transportation] funds by virtue of having parents take on

86

responsibility for transportation." *Frederick Classical Charter Sch., Inc.*, MSBE Op. No. 14-21 at 5.

The Court of Special Appeals held that "the charter agreement was unambiguous," and that it "clearly shifts the responsibility for transportation from [the Local Board] to Frederick Classical families." *Frederick Classical Charter School, Inc.*, 227 Md. App at 454. And, the Court of Special Appeals also agreed with the State Board that if a charter agreement "provides that either the charter school or families have a duty to transport the students, the result is that the local school system is *not* responsible for the transportation or for including funds for transportation in a per[-]pupil allocation." *Id.* at 457 (emphasis in original).

Frederick Classical contends that the State Board erred in its second interpretation, that it was "not entitled to transportation funds by virtue of having parents take on the responsibility of transportation." First, Frederick Classical asserts that the State Board erred because its charter agreement with the Local Board did not contain any agreement "to forego the portion of its per[-]pupil funding that equated to the Local Board's transportation budget." And, Frederick Classical contends that "[t]he State Board did not explain how . . . non-parties to [the charter agreement] (i.e., the 'families' of the students . . .) could have taken 'responsibility' in a way that involved them forfeiting funds to which Frederick Classical and [its] students were entitled."[32]

---

[32] The Local Board does not directly contest Frederick Classical's claims regarding the State Board's interpretation of the charter agreement in its brief to this Court. The Local Board apparently views the State Board's ruling here, and in its prior *Monocacy* ruling, as entirely based upon the State Board's interpretation of the commensurate funding

87

"The interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law," which this Court reviews *de novo*. *Ocean Petroleum, Co. v. Yanek*, 416 Md. 74, 86 (2010) (quoting *Clancy v. King*, 405 Md. 541, 556 (2008)). Maryland courts employ "an objective approach to contract interpretation, according to which, unless a contract's language is ambiguous, we give effect to that language as written without concern for the subjective intent of the parties at the time of formation." *Id.* Under that objective approach, we "restrict our inquiry to the four corners of the agreement and ascribe to the contract's language its customary, ordinary, and accepted meaning." *Id.* (citations and internal quotation marks omitted). "Ambiguity arises if, to a reasonable person, the language used is susceptible of more than one meaning or is of doubtful meaning." *Cochran v. Norkunas*, 398 Md. 1, 17 (2007).

The plain and unambiguous meaning of the transportation provision is that, aside from "[s]pecial education students with transportation on their [Individualized Education Plans]," or students "who live along an established bus route that passes the School facility," transportation to and from Frederick Classical is the responsibility of Frederick

requirement of ED § 9-109, and not upon provisions in a charter agreement. The Local Board expressly states in its brief that, in its view, the State Board's decision in *Monocacy* "was not based on any agreement by the charter school there that it would waive, forfeit, or forego transportation funding." The Local Board is incorrect. Both *Monocacy* and the instant decision affirmed the Local Board's funding allocation to a charter school in part based upon the State Board's interpretation of the commensurate funding requirement of ED § 9-109. But, both decisions **also** explicitly relied in part upon language in a charter agreement that the State Board interpreted to mean that the charter school had agreed it was not entitled to transportation funds. Indeed, in *Monocacy*, the sole basis on which the State Board affirmed the Local Board's exclusion of transportation funds from MMCI's allocation was its interpretation of a provision in MMCI's charter agreement. MSBE Op. No. 06-17 at 9.

Classical parents, and not Frederick Classical or the Local Board. We therefore agree with the State Board that "a plain reading of the Charter language" in the student transportation provision "indicates that [Frederick Classical] is not responsible for providing transportation." And we likewise agree with the Court of Special Appeals that the charter agreement unambiguously "shifts the responsibility for transportation from [the Local Board] to Frederick Classical families." *Frederick Classical Charter School, Inc.*, 227 Md. App at 454.

However, the funding provision is equally unambiguous. The funding provision states in part that "**[i]n accordance with ED § 9-109 and further clarified in corresponding State Board rulings**, the [Local] Board **shall disburse** to [Frederick Classical] an amount of county, state, and federal money for elementary, middle, and secondary students **that is commensurate with the amount disbursed to other public schools in the local jurisdiction**." (emphasis added). The plain meaning of the funding provision is that the Local Board must provide Frederick Classical with the full per-pupil commensurate funding allocation to which it is entitled under ED § 9-109, as clarified in the State Board's rulings regarding "commensurate" funding. The two State Board rulings that "further clarified" the State Board's position as to the meaning of the commensurate funding requirement in effect at the time the charter agreement was entered into in 2012 were the *City Neighbors* declaratory rulings and *Monocacy*. And, as we have explained above, under those rulings, Frederick Classical is entitled to a per-pupil allocation that includes a proportional share of transportation funding.

89

The two provisions in the charter agreement are not in conflict. Under the charter agreement, Frederick Classical is explicitly not responsible for providing transportation services to its pupils, although it may later decide to provide such a service. But, Frederick Classical still receives a commensurate share that includes transportation funds, which it may dedicate to providing other educational programs or services.

Nor is our interpretation of the charter agreement at odds with the State Board's decision in *Monocacy*. In that case, as discussed above, the Local Board withheld $420 in per-pupil transportation funding from MMCI based upon language in the charter agreement between MMCI and the Local Board, which stated that "transportation shall be the responsibility of MMCI except for students who live along [an] established [bus] route and for special education students." *Id.* The State Board in *Monocacy* interpreted that contract provision to mean that "MMCI essentially has agreed that it is not entitled to the transportation dollars contained in [the Local Board's] Total Operating Budget." *Id.* at 9. The State Board therefore reduced its "bottom line" average per-pupil amount by $420 "to reflect the transportation agreement." *Id.*

The State Board's interpretation of the contract provision in *Monocacy* appears to have been based in large part upon the state of the law at the time that the parties entered into the charter agreement. The charter agreement between the Local Board and MMCI at issue in *Monocacy* was dated January 14, 2005, **prior** to the State Board's issuance of the declaratory rulings in *City Neighbors* on May 26, 2005. Indeed, the State Board in *Monocacy* explicitly recognized that the charter school agreement between MMCI and the Local Board was a "pre-existing agreement." *Id.* at 10.

90

Thus, the State Board in *Monocacy* does not appear to have interpreted the provision that MMCI would provide transportation to unambiguously mean that MMCI had also agreed that it was not entitled to those services. Rather, the State Board apparently concluded that because the provision was entered into prior to the *City Neighbors* declaratory rulings, which clarified the meaning of commensurate funds, the provision was ambiguous, and should be interpreted to mean that MMCI had not only agreed to provide transportation services but also agreed it was not entitled to transportation funds.

Although we do not necessarily agree that the provision was ambiguous, or that if it was it somehow implied an agreement to forego transportation funding, those issues are not before us. The significance to the present case is that the State Board's interpretation of the transportation provision in *Monocacy* was limited to a situation where there was a "pre-existing" charter agreement that pre-dated the *City Neighbors* declaratory rulings. The *City Neighbors* declaratory rulings clarified that under ED § 9-109 a charter school is generally entitled to a proportional share of funding that a local school board budgets to certain services even if the charter school does not provide those services, so long as the charter school meets all explicit eligibility requirements under state or federal law. Therefore, after those rulings were issued and local school boards and charter schools learned of them, an agreement in a charter agreement that a charter school would not provide a certain service would not imply an agreement to forego a share of funds budgeted for that service.

Moreover, there is no indication in the State Board's *Monocacy* decision that the charter agreement between the Local Board and MMCI contained a funding provision

91

similar to the one in this case. Thus, the interpretation the State Board reached in *Monocacy* clearly does not apply to the charter agreement at issue here, which in addition to a transportation provision has a **separate** clear and unambiguous funding provision that states that the Local Board must provide to Frederick Classical the full commensurate funding allocation to which it is entitled under ED § 9-109 and the State Board precedent.

Therefore, we hold that the State Board and Court of Special Appeals erred in interpreting the transportation and funding provisions of the charter agreement to mean that Frederick Classical agreed that it is not entitled to transportation funds, and that the Local Board was thus not required to provide a proportional share of the transportation funds in Frederick Classical's per-pupil allocation. Consequently, we need not address Frederick Classical's additional contention that the State Board erred by ruling that a clause stating that non-parties to the contract would take responsibility for transportation could cause it to forego funding.

Although the charter agreement in this case plainly did not include an agreement that Frederick Classical would forego or waive transportation funding, any future charter school agreement that did contain such an express waiver of transportation funding, or any other funding to which a charter school would otherwise be entitled under current State Board precedent or policy—at present, the formula and approach set forth in the *City Neighbors* declaratory rulings—should be looked upon skeptically by the State Board or a reviewing court. Charter school agreements are, in theory, created through a negotiation process between a charter school and a local school board. However, under the Charter

School Program, the local school board is also the chartering authority that decides whether the agreement shall be approved. *See* ED § 9-103.

As we cautioned in *City Neighbors*, the flexibility sought by charter school advocates "created obvious areas of conflict with various components of the existing public school system," including "[local] school boards," which historically have "often vehemently opposed the effort" to establish new charter schools. 400 Md. at 329. In part because of that local opposition, we explained that the legislative history of the Charter Schools Program clearly showed a legislative intent to vest the State Board with the "primary authority to interpret, and the ultimate authority to implement [ED § 9-109]." *Id.* at 355. In contrast, we determined that "[t]here is nothing in the legislative record to suggest an intent to vest such ultimate authority in the local school boards, which, as noted, could lead not only to disparate methodologies for implementing a uniform State law but allow the very entities that had consistently opposed the legislative effort to throttle it through their administratively unreviewable funding policies." *Id.*

This history indicates that there is at least a possibility that local school boards may, in some instances, be tempted to abuse their position as the chartering authority for charter schools and dictate "take it or leave it" terms in a charter agreement that would require a charter school to forego funding to which it was otherwise entitled under ED § 9-109 and State Board precedent. If a charter school objects to such a provision, and appeals from a local board's decision to mandate the inclusion of such a provision to the State Board, the State Board should review it carefully to ensure that it is consistent with its own precedent and the legislative intent and purpose of the Charter Schools Program. And, if such a

provision in a charter agreement were subject to judicial review in an appeal of a State Board decision, courts should look carefully to determine whether the provision is unconscionable. *See, e.g.*, *Barrie Sch. v. Patch*, 401 Md. 497, 517, (2007) (defining an unconscionable contract as one that "involves extreme unfairness, made evident by (1) one party's lack of meaningful choice, and (2) contractual terms that unreasonably favor the other party") (citations and internal quotation marks omitted).

### III
### CONCLUSION

In summary, we have explained that the State Board erred as to all three issues raised in this appeal: in the standard of review it applied when reviewing Frederick Classical's appeal, in its ruling that Frederick Classical was not entitled to transportation funds because it did not provide transportation services, and in its conclusion that Frederick Classical was not entitled to transportation funds because it had agreed that it was not entitled to those funds in its charter agreement with the Local Board.

As to the standard of review, we hold today that the State Board erred by applying the deferential standard of review for decisions of local school board on a matter involving local policy or a local dispute defined in COMAR 13A.01.05.05(A)-(C) to the Local Board's decision to exclude transportation funds when calculating Frederick Classical's per-pupil allocation. Instead, we have concluded that the State Board must apply the "independent judgment" standard for the "explanation and interpretation of the public school laws and State Board regulations" defined in COMAR 13A.01.05.05(E).

94

We also determine today that the State Board's ruling that Frederick Classical was not entitled to transportation funds because it was not providing transportation services was directly contrary to its own precedent, particularly the *City Neighbors* declaratory rulings, and to the statutory purpose and legislative history of ED § 9-109 and the Charter Schools Program statute, ED §§ 9-101 *et seq.* Under the State Board's precedent in the *City Neighbors* declaratory rulings, a charter school is entitled to a proportional, per-pupil share of all funds in a local school board's total operating budget, except funds devoted to debt servicing and adult education, or if there are express eligibility restrictions in federal or state law for certain funds that a charter school has not met. In addition, a charter school must reimburse a local school board two percent of its allocation for central administrative expenses, as well as for salary, local retirement, and other fringe benefit costs for the public school employees working in the charter school, and regular services and supplies that the charter school **requests** the local school system provide. As there are no federal or state law restrictions on transportation funding to public schools,[33] under the *City Neighbors* declaratory rulings a local school board must therefore include the funds budgeted for transportation when calculating a charter school's per-pupil allocation, regardless of whether a charter school provides transportation services to its general student population,

[33] Although the General Assembly did not impose restrictions on the transportation funding for special education students in public schools that it grants to local county governments, pursuant to other eligibility requirements in state law specific to special education students, a charter school must actually provide transportation to those special education students who are entitled to transportation under ED § 8-410 in order to qualify for a proportional share of the local school board budget for funds budgeted to transport those students.

unless the charter school expressly requests that the local school system provide transportation for its students.

As the State Board's decision incorrectly stated that its ruling to uphold the Local Board's allocation that denied a proportional, per-pupil share of those funds to Frederick Classical was "consistent with [its] precedent," we hold that the State Board's decision was arbitrary and capricious and an abuse of its discretion. We hold that on remand and in future cases that the State Board may elect to depart from the formula and approach in its *City Neighbors* declaratory rulings but must do so either through an adjudicatory proceeding or through formal notice-and-comment rulemaking. However, we also hold that any new interpretation of the commensurate funding requirement in ED § 9-109, whether issued through an adjudicatory process or by rulemaking, must be consistent with the plain language of ED § 9-109 and the Charter School Program statute as a whole, and to the extent where the statutory language is ambiguous, the State Board must adhere to the statutory purpose and legislative history of those statutes as described in this opinion and our prior *City Neighbors* opinion. Furthermore, the State Board must offer a rational explanation for any decision that departs from its existing formula and approach. Such a rational explanation must include how the State Board's new interpretation or approach is in keeping with the plain language of ED § 9-109 and the Charter Schools Program statute, its statutory purpose and legislative history, and account for the legitimate reliance interests of charter school operators, staff and students, prospective charter school applicants, and local school boards.

Finally, we conclude today that the charter agreement in this case plainly did not include an agreement that Frederick Classical would forego or waive transportation funding, and accordingly hold that the State Board erred in deciding that Frederick Classical was not entitled to the inclusion of transportation funds in its per-pupil allocation based upon the charter agreement.

We therefore direct a remand to the State Board for it to apply the correct standard of review we have identified today, and to render a decision as to the claims raised by Frederick Classical consistent with our holdings as to its discretion to determine the proper "commensurate" funding allocation for Frederick Classical and that the charter agreement between Frederick Classical and the Local Board did not include an agreement to forego transportation funds. If the State Board determines that Frederick Classical is entitled to additional funds in its per-pupil allocation for the 2014 Fiscal Year, or for other years during the term of the charter agreement, it shall issue an order calculating the exact amount of additional funds owed based upon Frederick Classical's enrollment during the relevant years, and directing the Local Board to pay that amount.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT, AND UPON REMAND TO THE CIRCUIT COURT, WITH ADDITIONAL DIRECTIONS TO THAT COURT TO REMAND THE CASE TO THE STATE BOARD OF EDUCATION FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY RESPONDENT.**

Circuit Court for Frederick County
Case No. 10-C-14-001818

Argued: November 3, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 25

September Term, 2016

_____

FREDERICK CLASSICAL CHARTER
SCHOOL, INC.

v.

FREDERICK COUNTY BOARD OF
EDUCATION

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Dissenting Opinion by Watts, J., which Hotten,
J., joins

_____

Filed: July 14, 2017

Respectfully, I dissent.  I would affirm the judgment of the Court of Special Appeals.

Charter schools are a relatively recent development in Maryland.  In 2003, the General Assembly enacted the Public Charter School Act of 2003 and created a new Title 9 of the Education Article of the Code of Maryland.  See 2003 Md. Laws 2582 (Vol. IV, Ch. 358, S.B. 75); Balt. City Bd. of Sch. Comm'rs v. City Neighbors Charter Sch., 400 Md. 324, 329, 929 A.2d 113, 116 (2007).  In City Neighbors, 400 Md. at 328, 929 A.2d at 116, this Court explained:

> Charter schools are in the nature of semi-autonomous public schools that operate under a contract with a State or local school board.  The contract, or charter, defines how the school will be structured, staffed, managed, and funded, what programs will be offered, and how the school will operate and account for its activities.

In Maryland, the movement to establish charter schools was a long-fought battle fraught with controversy, including one involving a mandate for public funding of public charter schools.  See id. at 329-31, 929 A.2d at 116-17.  To that end, Md. Code Ann., Educ. (1978, 2014 Repl. Vol., 2016 Supp.) ("ED") § 9-109 provides: "A county board [of education] shall disburse to a public charter school an amount of county, State, and federal money for elementary, middle, and secondary students that is commensurate with the amount disbursed to other public schools in the local jurisdiction."[1]

---

[1]As originally enacted in 2003, Md. Code Ann., Educ. (1978, 2001 Repl. Vol., 2003 Supp.) § 9-109 contained the above-quoted language in subsection (a) and contained a subsection (b) stating that "[t]he State Board or the county board may give surplus educational materials, supplies, furniture, and other equipment to a public charter school." 2003 Md. Laws 2588 (Vol. IV, Ch. 358, S.B. 75).  In 2015, Md. Code Ann., Educ. (1978,

The controversy over public funding of a public charter school continues to this day and is at the heart of this case. In 2013, following the 2011 approval of its charter, Frederick Classical Charter School, Inc. ("Frederick Classical"), Petitioner, objected to the calculation of the per pupil allocation ("PPA") for the 2014 fiscal year made by Frederick County Board of Education ("FCBE"), also referred to as Frederick County Public Schools ("FCPS"), Respondent, because the PPA did not include funds for transportation. The Maryland State Board of Education ("the SBE") upheld the calculation by FCPS, as did the Circuit Court for Frederick County ("the circuit court") and the Court of Special Appeals. I would, too.

Although the majority opinion is well written, I disagree with its outcome. I would hold that: (I) the SBE did not err in upholding FCPS's PPA calculation and in concluding that FCPS provided full commensurate funding to Frederick Classical, despite the circumstance that the calculation did not include transportation funding, because FCPS complied with Maryland law and was not required to include funding for a service that Frederick Classical was not providing its students; and (II) the SBE applied the correct standard of review to FCPS's decision. Accordingly, I would affirm the judgment of the Court of Special Appeals, and in doing so, hold consistently with the appellate court, circuit court, and the SBE that have previously reviewed the matter.

Before delving into the background of this case and the reasons for affirming the judgment of the Court of Special Appeals, I think it useful to set forth for context some of

---

2014 Repl. Vol.) § 9-109 was amended and subsection (b) was deleted. See 2015 Md. Laws 1661, 1663 (Vol. II, Ch. 311, S.B. 595).

the relevant law concerning charter schools and transportation funding. As stated above, the General Assembly created the Maryland Public Charter School Program in 2003 by enacting a new Title 9 to the Education Article. See 2003 Md. Laws 2582 (Vol. IV, Ch. 358, S.B. 75). "The general purpose of the Program is to establish an alternative means within the existing public school system in order to provide innovative learning opportunities and creative educational approaches to improve the education of students." ED § 9-101(b).[2] ED § 9-103 provides that "[t]he public chartering authority for the granting of a charter shall be a county board of education." And, ED § 9-104 sets forth the process for applying to establish a public charter school. Funding is controlled by ED § 9-109, which, as stated above, provides: "A county board [of education] shall disburse to a public charter school an amount of county, State, and federal money for elementary, middle, and secondary students that is commensurate with the amount disbursed to other public schools in the local jurisdiction."

As to transportation of students, ED § 4-120(b) provides that, with an exception not relevant here, "each county board [of education] shall arrange for the transportation of students to and from consolidated schools." County school boards, however, are not required to provide transportation for all students who attend public schools. See ED § 7-

---

[2]In City Neighbors, 400 Md. at 329, 929 A.2d at 116, this Court explained:

The principal objective of those who desired to create [charter] schools—parents, educators, community groups, private entities—was to develop and implement innovative and more effective educational programs, and to do that, they needed and demanded freedom from some of the structural, operational, fiscal, and pedagogical controls that governed the traditional public school system.

801(b)(1) ("At its own expense, a county governing body **may provide transportation** for public school students in addition to the transportation provided by the State." (Emphasis added)); ED § 7-805(a) ("A school bus **may be used to transport** any student who lives within the mileage limit, if a mileage limit has been established by a local board of education, and if [certain conditions are satisfied]." (Emphasis added)). ED § 5-205(a) provides that "[t]he State shall distribute grants as provided under this section to the county boards to provide transportation services for public school students and disabled children for whom transportation is to be provided under [ED] § 8-410[.]" ED § 5-205(a) also sets restrictions on that funding, providing that a county board may apply "any excess funds" "to costs of pupil transportation in subsequent [fiscal] years[,]" and expressly mandating that "[a] county board may not transfer State revenues from the student transportation category to any other category as a result of this section."

As to the SBE's interpretation of "commensurate" funding under ED § 9-109, in its thorough opinion in this case, the SBE stated:

> The Charter School Program, which became law in 2003, requires that a local board "disburse to a public charter school an amount of county, State, and federal money for elementary, middle, and secondary students that is commensurate with the amount disbursed to other public schools in the local jurisdiction." [] E[D] § 9-109.
>
> On May 26, 2005, th[e SBE] issued three revised opinions explaining the meaning of the terms "commensurate" and "disbursed" in accordance with our power to interpret State education law. Th[e SBE] stated that the word "commensurate" meant "proportionate" and that "disbursed" meant "expended." *City Neighbors Charter Sch. v. Baltimore City Bd. of Sch. Comm'rs*, MSBE Op. No. 05-17 (2005). Th[e SBE] further stated that commensurate funding "includes funding for services for which students in the public charter schools are eligible such as free and reduced price meals, pre-kindergarten, special education, English-language learners, Perkins,

Title I, and transportation." *Id.*

In order to assist local school systems, th[e SBE] provided a formula designed to result in a proportionate amount. *Id.* The formula takes the annual school system operating budget (including all federal, State, and local funding) divided by the September 30 enrollment count for the previous year minus two percent for reasonable central office functions to arrive at the PPA. *Id.* In addition, the charter school may be responsible for reimbursing the school system for the cost of any services that the county provides. *Id.*

A year later, in *Monocacy Montessori Communities, Inc. v. Frederick County Bd. of Educ.*, MSBE Op. No. 06-17 (2006), th[e SBE] considered whether a different formula created by FCPS was consistent with State law and the [SBE]'s previous opinions. . . .

. . . [W]e explained that a school system could use a different formula so long as it resulted in a "bottom line amount of money such that th[e SBE] could conclude that the school system was providing proportionate/commensurate funds to the charter school." *Id.* We disagreed that the amount of funding must be "equal" because an equal PPA allocation would not take into account the value of in-kind services provided by FCPS. *Id.*

We next analyzed in *Monocacy* the formula applied by FCPS. A major difference in the FCPS formula was that it broke down the unrestricted budget in each of fifteen categories. Under the formula, no money was allocated for transportation because the charter school had agreed that it would provide for the transportation needs of its students. We noted that transportation dollars had been a part of the [SBE]'s standard formula, but that the charter school would not be entitled to these funds if it had agreed to forgo them. After analyzing the FCPS formula in full and comparing it to our own formula, th[e SBE] concluded that FCPS needed to pay an additional $12 per pupil in order to meet the commensurate funding requirement. *Id.*

Thus, significantly, as gleaned from the SBE's opinion, in Monocacy, the SBE ruled that a county board of education could use an alternative funding formula, provided that the formula resulted in a PPA that was similar to the PPA set forth in the SBE's decision in City Neighbors, which this Court affirmed in City Neighbors, 400 Md. at 328, 929 A.2d at 115-16.

As to the facts and procedural history of the case, on April 6, 2011, FCPS approved

Frederick Classical's charter application to form the Frederick Classical Charter School

("the School"). FCPS and Frederick Classical subsequently entered into a contract, the

charter, that set forth the various terms governing the School. As to school funding, Section

A of Part V of the charter states:

> In accordance with [ED] § 9-109 and further clarified in corresponding
> [SBE] Rulings, the [FCPS] shall disburse to [the School] an amount of
> county, [S]tate, and federal money for elementary, middle, and secondary
> students that is commensurate with the amount disbursed to other public
> schools in the local jurisdiction. [The School] may seek and receive other
> funds through local, [S]tate or federal government sources and/or from
> private sources without a reduction in its annual commensurate allocation.
>
> Board Policy 440 Section 1.2 indicates an approved public charter school
> shall receive funding as determined by Maryland law, which may be
> comprised of discretionary funds and in-kind services. Annual funding will
> be made on a "per pupil" basis for student enrollment projections as
> identified in the application for year 1 up to a maximum of 280 students, for
> year 2 up to a maximum of 320 students, and year 3 and beyond up to a
> maximum of 560 students. Under enrollment as identified by the September
> 30 enrollment count may result in funding adjustments for current fiscal year.
>
> As to transportation of students, Section H of Part II of the charter provides:
>
> Transportation shall be the responsibility of [the School] families with the
> following exceptions:
>
> 1. Students who live along an established bus route that passes the School
> facility; and
> 2. Special education students with transportation on their [individualized
> education program]s.
>
> If [the School] subsequently determines to provide transportation during the
> term of this Charter, it may contract with an approved provider for
> transportation services within provisions allowable under the negotiated
> agreement.
>
> On June 26, 2013, FCPS provided Frederick Classical with its calculation of funding

for the 2014 fiscal year, with the PPA calculated at $8,818.54, resulting in Frederick Classical receiving approximately $2.4 million for the 2014 fiscal year based on an enrollment of 280 students.  On August 14, 2013, Frederick Classical submitted its budget to FCPS and, in a letter accompanying the budget, objected to FCPS's calculation of the PPA because it did not include transportation funds.  In a letter dated September 25, 2013, FCPS denied Frederick Classical's request.

On October 25, 2013, Frederick Classical appealed FCPS's decision to the SBE.  In the appeal, Frederick Classical argued that FCPS's decision was inconsistent with ED § 9-109 and the SBE's precedent, and requested that the SBE reverse FCPS's decision to deny the School "commensurate funding as required under [ED] § 9-109[,]" or, alternatively, "request[ed] a declaratory ruling directing that [FCPS] revise its funding allocation to [the School]."  Frederick Classical also asserted that, because the case involved "a dispute as to State public school law[,]" the SBE should "exercise its independent judgment" in evaluating the appeal.  FCPS filed with the SBE a "Response and Motion for Summary Affirmance," in which it "denie[d] that its decision regarding funding . . . was arbitrary, unreasonable[,] or illegal" and argued that it was "entitled to judgment as a matter of law."

On May 20, 2014, the SBE issued an Opinion affirming FCPS's decision "because it [wa]s not arbitrary, unreasonable, or illegal[,]" and "deny[ing] the request for a declaratory ruling."[3]  As to the standard of review, the SBE stated that, because the "appeal concern[ed] a controversy or dispute regarding the rules and policies of a local board[,]"

---

[3]The SBE's opinion is Frederick Classical Charter Sch., Inc. v. Frederick Cty. Bd. of Educ., MSBE Op. No. 14-21 (2014).

[FCPS]'s decision must be considered *prima facie* correct and upheld unless [Frederick Classical] prove[d] that [FCPS]'s decision was arbitrary, unreasonable, or illegal." (Citations and internal quotation marks omitted). The SBE reviewed its previous rulings concerning the allocation of money to public charter schools, and "reiterated" the following:

> [C]ommensurate funding does not mean that the PPA must be exactly the same between a charter school and other public schools. The value of in-kind services provided by FCPS, for instance, can be accounted for to ensure that the [S]chool does not receive more than its equal share of funds. [Frederick Classical]'s argument – that counties must provide charter schools with a lump sum without regard to the services provided – is contrary to our ruling in *Monocacy*. Although transportation costs are among the funds that *could* be included in a PPA, this will depend on the arrangement between the local school system and the charter school. The bottom line is that a charter school is not automatically entitled to funds for services [that] it does not provide.

(Emphasis in original) (footnote omitted).

Thus, according to the SBE, the question at hand was "whether Frederick Classical was entitled to transportation funds as part of its PPA." After reviewing the pertinent language of the charter concerning transportation of students, the SBE expressly concluded:

> [A] plain reading of the Charter language indicates that [Frederick Classical] is not responsible for providing transportation. Rather, the responsibility falls on parents and the county (for students living along an established route or special education students). [Frederick Classical] seeks transportation funds, but it does not appear that [Frederick Classical] provides any transportation services. As we noted in *Monocacy*, if [Frederick Classical] received funds for services [that] it did not provide, it would be receiving more than its commensurate share of county funds.

The SBE affirmed FCPS's decision, and ruled: "Taking into account transportation costs

is consistent with our prior rulings. In determining a PPA, it is not arbitrary, unreasonable[,] or illegal for a county to consider the actual services provided by the charter school to reach a commensurate level of funding." The SBE also denied Frederick Classical's request for a declaratory ruling, explaining that, "[b]ecause [the SBE] concluded that the transportation allocation was not contrary to State law and the formula used by [FCPS wa]s consistent with [the SBE's] past rulings," there was no reason to issue a declaratory ruling that the funding allocation was contrary to State law.

On June 18, 2014, Frederick Classical filed in the circuit court a petition for judicial review, and on February 4, 2015, the circuit court issued an Order and Opinion affirming the SBE's decision.

On March 6, 2015, Frederick Classical noted an appeal to the Court of Special Appeals. In a reported opinion, with Judge Robert A. Zarnoch writing for the Court, the Court of Special Appeals affirmed the judgment of the circuit court, holding "that the [SBE] did not err in upholding the decision of FCPS not to include transportation funding for Frederick Classical because FCPS complied with [SBE] rulings and [S]tate education law." Frederick Classical Charter Sch., Inc. v. Frederick Cty. Bd. of Educ., 227 Md. App. 439, 443, 134 A.3d 376, 378 (2016). As to the applicable standard of review, the Court of Special Appeals concluded that, because the SBE "was deciding a matter of education policy," its decision "deserve[d] the heightened deference accorded to it[,]" explaining that "the issues involved in this proceeding constitute an interplay between Frederick Classical's charter, [FCPS's] funding formula, and [SBE] decisions—matters of education policy rooted deeply in the powers of the [SBE]." Id. at 451, 134 A.3d at 383. Thereafter,

Frederick Classical filed in this Court a petition for a writ of *certiorari*, which this Court granted. See Frederick Classical Charter Sch. v. Frederick Cty. Bd. of Educ., 448 Md. 724, 141 A.3d 135 (2016).

The parties dispute the standard of review applicable to the SBE's decision. Frederick Classical contends that the SBE's decision is not entitled to deference because "[n]o matters of education policy or local board policy [a]re implicated and no material facts [a]re disputed[,]" and rather, the issues in the case are "purely legal in nature" and "involve[] only application of unambiguous contract language and, potentially, application of State law, including judicial and [SBE] precedent." FCPS disagrees and contends that the SBE's decision must be given heightened deference because this case involves educational policy and because this Court has concluded that, in cases dealing with charter school funding, the SBE's rulings are entitled to heightened, not less, deference. I agree mostly with FCPS.

In Kenwood Gardens Condos., Inc. v. Whalen Props., LLC, 449 Md. 313, 324-25, 144 A.3d 647, 654-55 (2016), this Court set forth the standard of review generally applicable to an administrative agency's decision, stating:

> In reviewing the final decision of an administrative agency, . . . we look through the circuit court's and intermediate appellate court's decisions, although applying the same standards of review, and evaluate the decision of the agency. Our scope of review is narrow and is limited to determining whether there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law. We defer to the regulatory body's fact-finding and inferences, provided [that] they are supported by evidence [that] a reasonable person could accept as adequately supporting a conclusion. However, if we determine that the agency's decision is based on an erroneous conclusion of law, no deference is given

- 10 -

to those conclusions. Even though the decision of the [administrative agency] was based on the law, its expertise should be taken into consideration and its decision should be afforded appropriate deference in our analysis of whether it was premised upon an erroneous conclusion of law.

(Citations, brackets, and internal quotation marks omitted). See also Charles Cty. Dep't of Soc. Servs. v. Vann, 382 Md. 286, 294, 855 A.2d 313, 318 (2004) ("As a court sitting in judicial review of an administrative agency decision, . . . we reevaluate the decision of the agency under the same statutory standards as would the circuit court, and we do not employ those standards to reevaluate the decision of the circuit or intermediate appellate court." (Citations omitted)). In Gigeous v. E. Corr. Inst., 363 Md. 481, 496, 769 A.2d 912, 921 (2001), this Court further explained that "generally[,] judicial review of administrative agency action is narrow. The court's task on review is not to substitute its judgment for the expertise of those persons who constitute the administrative agency." (Citation, brackets, emphasis, and internal quotation marks omitted). The Court of Special Appeals has also explained that an appellate court "examine[s] whether the agency's decision is in accordance with the law or whether it is arbitrary, illegal, and capricious." Venter v. Bd. of Educ., 185 Md. App. 648, 664-65, 972 A.2d 328, 337, cert. denied, 410 Md. 561, 979 A.2d 709 (2009) (citation and internal quotation marks omitted).

As to review of decisions of the SBE specifically, in Patterson Park Pub. Charter Sch., Inc. v. Balt. Teachers Union, 399 Md. 174, 195-97, 923 A.2d 60, 73-74 (2007), this Court described in detail as follows:

The [SBE]'s authority over the educational system is unique in the annals of administrative agencies. As "the head of the Department of Education," it is vested with the power to determine policies and set forth bylaws, rules[,] and regulations for the administration of public schools, as well as interpret both

- 11 -

statutory provisions of the Education Article, and its own by-laws, rules, and regulations. [ED §§] 2-101 and 2-205.

We noted in *Board of Education for Dorchester County v. Hubbard*, 305 Md. 774, 506 A.2d 625 (1986), that,

> while administrative agencies generally may interpret statutes, as well as rule upon other legal issues, and while an agency's interpretation of a statute which it administers is entitled to weight, the paramount role of the [SBE] in interpreting the public education law sets it apart from most administrative agencies.

*Id.* at 790-91, 506 A.2d at 633 (footnote omitted).

We recently reviewed the authority of the [SBE] in *Board of Education of Talbot County v. Heister*, 392 Md. 140, 896 A.2d 342 (2006), stating:

> Our cases have long made clear that the [SBE] has very broad statutory authority over the administration of the public school system in this State.
>
> * * *
>
> In *Wilson v. Board of Educ. of Montgomery County*, we noted that "[t]he totality of these provisions, quite plainly we think, invests the [SBE] with the last word on any matter concerning educational policy or the administration of the system of public education. This has been described as 'a visitatorial power of the most comprehensive character'." We have had occasion to explain the scope and purpose of this visitatorial power:
>
> We think it beyond question that the power of visitation vested in the [SBE] is one of general control and supervision; it authorizes the [SBE] to superintend the activities of the local boards of education to keep them within the legitimate sphere of their operations, and whenever a controversy or dispute arises involving the educational policy or proper administration of the public school system of the State, the [SBE]'s visitatorial power authorizes it to correct all abuses of authority and to nullify all irregular proceedings.

- 12 -

* * *

> The [SBE]'s powers are not without limit or their exercise unreviewable. . . . The [SBE] may not decide finally purely legal questions, and may not exercise its powers arbitrarily or capriciously. Regarding the first listed limitation, however, we have noted, in the context of decision-making by administrative bodies generally, that "with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency."

*Id.* at 152-155, 896 A.2d at 349-51 (footnote omitted) (citations omitted). *See also Halsey v. Bd. of Educ. of Garrett County*, 273 Md. 566, 572, 331 A.2d 306, 309 (1975) ("The [SBE] cannot be asserted to finally decide purely legal questions.").

> Thus, the decisions of the [SBE] are entitled to greater deference than those of most other administrative agencies. *Heister*, 392 Md. at 155, 896 A.2d at 351.

(Brackets omitted) (ellipsis and asterisks in original).

In City Neighbors, 400 Md. at 342-43, 929 A.2d at 124, this Court also discussed

the standard of review applicable to a decision by the SBE, stating:

> [The] SBE has very broad statutory authority over the administration of the public school system in this State, that the totality of its statutory authority constitutes a visitatorial power of such comprehensive character as to invest the [SBE] with the last word on any matter concerning educational policy or the administration of the system of public education, that this power is one of general control and supervision, that it authorizes the [SBE] to superintend the activities of the local boards of education to keep them within the legitimate sphere of their operations, and that[,] whenever a controversy or dispute arises involving the educational policy or proper administration of the public school system of the State, the [SBE]'s visitatorial power authorizes it to correct all abuses of authority and to nullify all irregular proceedings.

(Citation, footnotes, and internal quotation marks omitted). This Court further explained

that, although "it is the courts that ultimately must decide purely legal questions, the broad

- 13 -

statutory mandate given to [the] SBE requires that special deference be given to its interpretation of statutes that it administers." Id. at 343, 929 A.2d at 124 (citation omitted). In that regard, because of "the paramount role of the [SBE] in interpreting the public education law[, which] sets it apart from most administrative agencies[,]" the SBE's "rulings must be given heightened, not less, deference." Id. at 343, 929 A.2d at 125 (citation and internal quotation marks omitted).

This Court explained that the standard of review accorded to the SBE's decisions is consistent with the principles embodied in Md. Code Regs. ("COMAR") 13A.01.05.05, governing the SBE's review of a local board of education's decision, stating:

> This unbroken and consistent line of cases supports the precepts embodied in COMAR 13A.01.05.05—that (1) decisions of a local board involving a *local* policy or a dispute regarding rules or regulations of the *local board* shall be considered by [the] SBE as *prima facie* correct, and [the] SBE will not substitute its judgment for that of the local board in such cases unless the local decision is arbitrary, unreasonable, or illegal, but (2) [the] SBE shall exercise its independent judgment on the record before it in the explanation and interpretation of the State public school laws and [SBE] regulations. A local board decision will be regarded as arbitrary or unreasonable if it is contrary to sound educational policy[,] and it will be regarded as illegal if it misconstrues the law or is an abuse of discretionary powers.

City Neighbors, 400 Md. at 343-44, 929 A.2d at 125 (emphasis in original) (brackets, internal quotation marks, and some citations omitted).

In City Neighbors, id. at 344, 929 A.2d at 125, a case involving the interpretation of ED § 9-109, this Court determined that the following standard of review was applicable to the SBE's decision:

> In these cases, [the] SBE was construing a State statute, not a local board policy or regulation. It therefore owed little deference to the city and

county board decisions, but was required to exercise its own independent judgment as to the proper interpretation of ED § 9-109, and, under our long-established jurisprudence, the courts are required to give substantial deference to the SBE interpretation, especially as that interpretation, though ultimately a legal conclusion, is laced with substantial educational policy. We give no more deference to the city and county boards' decision than [the] SBE was required to give. It is the SBE decision that we review.

In City Neighbors, id. at 347-48, 929 A.2d at 127, this Court also explained that "heavy deference [] must be accorded to SBE interpretations of the public school laws, especially interpretations that go beyond purely legal determinations and affect or implement significant educational policy." In that regard, "[s]o long as the SBE interpretation is not patently wrong, we would ordinarily defer to it." Id. at 348, 929 A.2d at 127. And, "[t]o the extent that we desire to look further, we would apply the most relevant rules of statutory construction to determine the legislative intent, and, in that regard, may consider legislative history and statutory purpose." Id. at 348, 929 A.2d at 127 (citation omitted).

In this case, the SBE was not only construing a State statute—ED § 9-109—and the allocation of money to a public charter school, as well as Frederick Classical's charter and the SBE's prior opinions, but was also construing and analyzing FCPS's funding formula or policy. In other words, this case involves not only matters of educational policy, the SBE's interpretation of a statute that it administers, and the proper administration of the public school system in Maryland—all matters that are uniquely within the SBE's purview—but also matters of FCPS's policy. As such, as this Court has previously recognized, I would conclude that, under COMAR 13A.01.05.05, the SBE owed deference to FCPS's decision, but was nevertheless required to exercise its independent judgment as to the proper interpretation of ED § 9-109. See City Neighbors, 400 Md. at 343-44, 929

- 15 -

A.2d at 125. This Court, in turn, is "required to give substantial deference to the SBE [statutory] interpretation, especially as that interpretation, though ultimately a legal conclusion, is laced with substantial educational policy." Id. at 344, 929 A.2d at 125. Accordingly, in this case, I would accord heightened deference to the SBE's "interpretations of the public school laws, especially interpretations that go beyond purely legal determinations and affect or implement significant educational policy[,]" such as the commensurate funding scheme of charter schools. Id. at 347-48, 929 A.2d at 127. I note, however, that "it is the courts that ultimately must decide purely legal questions[.]" Id. at 343, 929 A.2d at 124.

Although I would accord heightened deference to the SBE's decision, I would review that decision like any other administrative agency's decision, and examine "whether the agency's decision is in accordance with the law or whether it is arbitrary, illegal, and capricious." Venter, 185 Md. App. at 664-65, 972 A.2d at 337 (citation and internal quotation marks omitted). To that end, "[d]ecisions contrary to law or unsupported by substantial evidence are not within the exercise of sound administrative discretion, but are arbitrary and illegal acts." Hurl v. Bd. of Educ. of Howard Cty., 107 Md. App. 286, 306, 667 A.2d 970, 980 (1995) (citations and internal quotation marks omitted). COMAR 13A.01.05.05, concerning the SBE's review of a local board's decision, provides additional guidance of what constitutes an arbitrary, illegal, or capricious decision. For example, a decision is arbitrary or unreasonable if "[i]t is contrary to sound educational policy" or if "[a] reasoning mind could not have reasonably reached the conclusion the local board or local superintendent reached." COMAR 13A.01.05.05B(1), (2). A decision is illegal if,

among other things, the decision "[e]xceeds the statutory authority or jurisdiction of the local board" or "[m]isconstrues the law[.]"  COMAR 13A.01.05.05C(2), (3).  Finally, in my view, the issue of the appropriate standard for appellate review is distinct from the question of whether the SBE applied the appropriate standard in reviewing FCPS's determination.

Having discussed the applicable standard of review, from my perspective, a review of the parties' contentions as to the merits is worthwhile to frame the issues.  In sum, Frederick Classical contends that the SBE erred in ruling that Frederick Classical contractually agreed to forego the portion of its PPA that equated to FCPS's transportation budget, and argues that the charter does not contain a provision that Frederick Classical would forego any funding.  Frederick Classical asserts that withholding the funds for transportation results in a disbursement of funds to it that is non-commensurate with the amount disbursed to other public schools in the local jurisdiction.  Frederick Classical maintains that the withheld funds are retained in the school system budget and "inevitably" spent on other students in the school district.

Frederick Classical contends that the SBE erred by misinterpreting its own precedent in Monocacy—by determining that it had ruled that a charter school can receive only funds that are associated with State-defined categories of services that the charter school itself provides—and then relying on that misinterpretation in its decision to deny funding to Frederick Classical.  Frederick Classical asserts that Monocacy simply stands for the proposition that, if a charter school decides to buy something from the local board of education, it must pay, from its PPA, the cash to make that purchase, and that the charter

- 17 -

school cannot get both the cash and the purchase. Frederick Classical maintains that no SBE precedent requires a charter school be denied funds associated with activities that the charter school is not performing.

FCPS responds that the SBE correctly determined that FCPS's PPA calculation was proper, because its formula resulted in an amount of money that was proportionate or commensurate with the funds accorded other public schools, and the resulting allocation was fully consistent with the SBE's opinions in City Neighbors and Monocacy. FCPS argues that, both here and in Monocacy, the charter school agreed that it would not provide transportation services to its students, and because of the lack of transportation services, the charter school is not entitled to funding for those services. FCPS asserts that the issue in this case is not whether Frederick Classical agreed to forego certain funding, but rather whether the funding formula that was utilized violates the requirement for commensurate funding. According to FCPS, logically, if charter school students are not eligible for certain services, the charter school is not entitled to funding for those services.

FCPS contends that the ability of Frederick Classical to determine its priorities is not impacted by not receiving transportation funding because, based on the PPA received, Frederick Classical has the authority to allocate funding in whatever manner it deems appropriate, so long as it complies with Maryland law. FCPS points out that its funding formula does not result in a redistribution of funds to non-charter school students, and maintains that its transportation budget includes funds to pay for services that are actually provided, and does not include costs for students who are not transported by FCPS. In other words, according to FCPS, it is not retaining money from the budget that will be

redistributed and spent on other students in the school district.

In resolving the respective contentions of the parties, I would hold that the SBE did not err in upholding FCPS's PPA calculation or in concluding that FCPS provided full commensurate funding to Frederick Classical, despite the circumstance that the calculation did not include transportation funding, because FCPS was not required to include funding for a service that Frederick Classical was not providing and complied with Maryland law in not providing funding for a nonexistent service. I would begin by examining the provisions of the charter. As to transportation, Frederick Classical agreed that "[t]ransportation shall be the responsibility of [the School] families with the following exceptions: 1. Students who live along an established bus route that passes the School facility; and 2. Special education students with transportation on their [individualized education program]s." (Paragraph breaks omitted). Stated otherwise, by its plain language, with the two noted exceptions, neither FSCPS nor Frederick Classical provides transportation for the School's students. The language of the charter is clear—the responsibility for transportation has been shifted from FCPS, and Frederick Classical, to Frederick Classical families. Put simply, under the provisions of the charter, Frederick Classical does not provide transportation for its students. As the SBE concluded, if Frederick Classical were to "receive[] funds for services [that] it did not provide, it would be receiving more than its commensurate share of county funds." A charter school is not entitled to funds for services that it does not provide. As ED § 9-109 provides, a charter school must receive "commensurate" funding, and does not address providing funding for services a charter school does not provide. A charter school that does not provide

transportation for its students is not entitled to funds for transportation simply by virtue of the circumstance that other schools in the school system do, in fact, receive funds for transportation that the schools provide.

I am unpersuaded by Frederick Classical's contention that the SBE erred in allegedly concluding that Frederick Classical had contractually agreed to forego transportation funding. As an initial matter, the heart of the matter at hand is not whether Frederick Classical has contractually forgone transportation funding, but rather whether the funding formula utilized by FCPS complied with ED § 9-109's requirement of commensurate funding. As to that core issue, I would conclude that the SBE did not err in upholding the funding formula that FCPS utilized because that formula resulted in commensurate funding for Frederick Classical based on the services that Frederick Classical provides, and is consistent with Maryland law.

In its opinion in City Neighbors, MSBE Op. No. 05-17 at 4-5, the SBE set forth, as guidance and direction, a general formula or methodology for local boards of education to utilize in determining commensurate funding under ED § 9-109. According to the SBE, commensurate funding under ED § 9-109 means "that a public charter school receive federal, State, and local funding in an amount proportionate to the amount of funds expended for elementary, middle, and secondary level students in the other public schools in the same system." City Neighbors, MSBE Op. No. 05-17 at 3. And commensurate funding "includes funding for services for which students in the public charter schools are eligible such as free and reduced price meals, pre-kindergarten, special education, English-language learners, Perkins, Title I, and transportation." Id. at 3-4. In City Neighbors, id.,

the SBE did not state that commensurate funding includes funding for services for which public charter school students are not eligible. Indeed, the SBE recognized that "a charter school is a public school operating with agreed upon terms of flexibility within a public school system." Id. at 5. And, in the guidance documents that were incorporated into the opinion, it was provided that "[t]he actual funding sources that would be provided to the school would be dependent upon the specific school's eligibility for those restricted funds." Stated otherwise, in its opinion in City Neighbors, the SBE plainly tied commensurate funding to inclusion of funding for services for which a charter school is eligible; *i.e.*, presumably, if a charter school is ineligible for certain services, then commensurate funding for the charter school need not include funding for those services.

That such an approach was envisioned by the SBE is supported by another guidance document incorporated into the SBE's opinion—namely, the SBE's May 24, 2005 Technical Assistance Bulletin, which provided, at least in the context of transportation for special education students, that the charter should address such transportation, and that the charter "may include the Charter School returning to the [local school system] the portion of funds provided for transportation or the Charter School providing the transportation service for the student." Additionally, in setting forth the formula for commensurate funding, the SBE expressly stated that

> [f]or the special services that must be provided to its eligible students, the charter school must choose whether it will provide those services directly or whether those services will be provided by the school system. If the latter, the charter school must reimburse the school system the proportionate cost of those services.

City Neighbors, MSBE Op. No. 05-17 at 5. In other words, as gleaned from the Technical

- 21 -

Assistance Bulletin and the SBE's formula, the SBE contemplated the circumstance that a charter school would not receive funds, or would have to return funds that it had received, if it was not providing the transportation services—or any service that was required to be provided to eligible students—itself; *i.e.*, a charter school is not entitled to, or eligible for, funding for services that it is not providing. In short, nothing in the SBE's opinion in City Neighbors leads to the conclusion that the SBE intended to require that a local board of education provide transportation funding to a charter school in all circumstances, regardless of whether the charter school actually was providing transportation services.

This Court ultimately affirmed the SBE's decision and formula. See City Neighbors, 400 Md. at 328, 929 A.2d at 116. This Court noted that "[t]he SBE rulings allow the charter schools to negotiate for the provision of services, if they would rather have the services, for which they would be required to reimburse the county boards." Id. at 356, 929 A.2d at 132. In other words, this Court affirmed the principle that was expressed by the SBE that a charter school is not entitled to both the funding for certain services and the provision of those services by the local board. Extrapolating this reasoning to its logical conclusion demonstrates that a charter school is simply not authorized to receive funding for services that it does not provide.

Thereafter, in Monocacy, MSBE Op. No. 06-17 at 4-5, the SBE made clear that the formula set forth in City Neighbors is not a strict and rigid standard by which all funding determinations are to be made, and that local boards of education may utilize their own formulas so long as the formula results in commensurate funding pursuant to ED § 9-109. In that case, there was no issue as to the circumstance that the local board had provided no

funding for transportation because, in the charter agreement, the charter school agreed that it, not the local board, would be responsible for providing transportation. Monocacy, MSBE Op. No. 06-17 at 6, 8-9. Indeed, the SBE acknowledged that one of the reasons accounting for the difference between the PPA derived from utilizing the local board's formula versus the SBE's formula was because the local board "put no money into the charter school budget for transportation" as a result of the charter agreement providing that the charter school would provide transportation; by contrast, transportation funding was included in the SBE's calculation of the PPA. Id. at 8. The SBE recognized that, in Monocacy, the charter school had agreed, in the charter agreement, to "absorb the cost of transportation." Id. at 10. The SBE's conclusion in Monocacy demonstrates that the charter agreement can be determinative of whether funding for certain services is provided to a charter school. Thus, although a charter school that provides transportation to its students may be eligible to receive transportation funding as part of its PPA, a charter school that provides transportation services can agree, in a charter agreement, to absorb the cost of transportation such that the charter school will not have that funding included in its PPA.

To be sure, this case is distinguishable from Monocacy in that neither the charter school, Frederick Classical, nor the local board, FCPS, is providing transportation. However, the principles that were developed in City Neighbors and Monocacy are equally applicable here. The charter expressly provides that Frederick Classical families—not Frederick Classical or FCPS—are responsible for transportation of students with the two exceptions delineated in the charter. And, logically, the charter mentions nothing about

Frederick Classical agreeing to absorb the cost of transportation or foregoing transportation funding. This is so because Frederick Classical, in not providing transportation, has no costs related to transportation. Indeed, to provide Frederick Classical with funding for transportation services that it does not provide would result in Frederick Classical receiving more than commensurate funding because the charter school would receive funds for a nonexistent service for which there is no attendant cost, and the funds would remain available to the charter school for whatever use it deemed appropriate. In contrast, schools that provide transportation services to students and, therefore, receive funding for transportation services covering the cost of those services would necessarily have no such excess funds available for use.

Had Frederick Classical agreed to provide transportation for its students and not agreed to absorb the cost of such funding, then, Frederick Classical would be entitled to transportation funding. If, as in <u>Monocacy</u>, Frederick Classical had agreed to provide transportation but agreed to absorb the cost of transportation services, then Frederick Classical would not be entitled to transportation funding. Frederick Classical would also not be entitled to transportation funding if the charter provided that FCPS would provide transportation services. In this case, Frederick Classical is not entitled to transportation funding for transportation services it does not provide—services that, instead of being provided by FCPS, are being provided by Frederick Classical families. In sum, I would conclude that the SBE was correct in determining that FCPS's decision and funding formula—which did not include transportation funding because, per the provisions of the charter, Frederick Classical was not providing transportation services—is consistent with

the SBE's opinions in <u>City Neighbors</u> and <u>Monocacy</u> and this Court's opinion in <u>City Neighbors</u>, and fully satisfies the requirement of ED § 9-109 for commensurate funding.

As a final matter on this issue, I point out that commensurate funding under ED § 9-109 does not mean equal funding. Indeed, in <u>Monocacy</u>, MSBE Op. No. 06-17 at 10, the SBE expressly rejected a charter school's equal funding formula because utilizing that formula "results in an amount greater than a proportionate amount[,]" and, accordingly, "using such a formula does not comport with the statutory requirement for commensurate funding." FCPS is not required to include transportation funding in Frederick Classical's PPA simply because FCPS may provide transportation funding to other public or charter schools. Again, equal funding is not required under the statute; commensurate funding is. Indeed, to provide transportation funding to Frederick Classical—a charter school that does not provide transportation services—would lead to the exact problem that was recognized by the SBE in <u>Monocacy</u>—an amount greater than a proportionate amount being given to Frederick Classical. Accordingly, for all of the reasons discussed above, I would hold that the SBE did not err in upholding FCPS's PPA calculation and in concluding that FCPS provided full commensurate funding to Frederick Classical.

Raising an issue distinct from the appropriate standard of appellate review, Frederick Classical contends that the SBE improperly deferred to FCPS and failed to exercise its independent judgment in reviewing FCPS's decision, *i.e.*, that the SBE applied an erroneous standard of review. According to Frederick Classical, its appeal involved issues concerning the explanation and interpretation of a contract, State public school laws, and the SBE's prior opinions, and did not involve a local policy or a dispute about FCPS's

rules and regulations; therefore, the SBE was required to exercise its independent judgment. FCPS responds that the SBE applied the correct standard of review in rendering its decision.

COMAR 13A.01.05.05A, which governs the SBE's review of decisions of a local board, provides: "Decisions of a local board involving a local policy or a controversy and dispute regarding the rules and regulations of the local board shall be considered prima facie correct, and the [SBE] may not substitute its judgment for that of the local board unless the decision is arbitrary, unreasonable, or illegal." COMAR 13A.01.05.05E provides: "The [SBE] shall exercise its independent judgment on the record before it in the explanation and interpretation of the public school laws and [SBE] regulations." As stated above, in City Neighbors, 400 Md. at 343-44, 929 A.2d at 125, this Court further explained:

> This unbroken and consistent line of cases supports the precepts embodied in COMAR 13A.01.05.05—that (1) decisions of a local board involving a *local* policy or a dispute regarding rules or regulations of the *local board* shall be considered by [the] SBE as *prima facie* correct, and [the] SBE will not substitute its judgment for that of the local board in such cases unless the local decision is arbitrary, unreasonable, or illegal, but (2) [the] SBE shall exercise its independent judgment on the record before it in the explanation and interpretation of the State public school laws and [SBE] regulations. A local board decision will be regarded as arbitrary or unreasonable if it is contrary to sound educational policy[,] and it will be regarded as illegal if it misconstrues the law or is an abuse of discretionary powers.

(Emphasis in original) (brackets, internal quotation marks, and some citations omitted).

I would conclude that the SBE applied the correct standard of review to FCPS's decision. Although, in its opinion, the SBE set forth the standard of review dictated by COMAR 13A.01.05.05A, and noted that the case involved "a controversy or dispute

regarding the rules and policies of a local board[,]" the opinion demonstrates that, with respect to matters of State law and contract interpretation, the SBE applied its independent judgment in reviewing FCPS's decision. Ultimately, the issue in this case involving ED § 9-109 turned on a matter of statutory and case law interpretation—a matter that required the SBE to apply its independent judgment as provided by COMAR 13A.01.05.05E. In my view, that the SBE did not recite the standard from COMAR 13A.01.05.05E, in assessing issues as to the charter and State law, is of no consequence when it is evident from the SBE's opinion that the SBE did, in fact, exercise its independent judgment in reviewing the matters. The SBE issued a comprehensive opinion, in which it reviewed the cases of City Neighbors and Monocacy, and the opinion demonstrates that the SBE was well aware that it was interpreting a matter involving the application of State law. Indeed, in its opinion, the SBE stated: "Because we concluded that the transportation allocation was not contrary to State law and the formula used by [FCPS] is consistent with our past rulings, we deny [Frederick Classical]'s request for a declaratory ruling." There is no indication in its opinion that the SBE viewed FCPS's decision as *prima facie* correct or that it was predisposed to do so.

From my perspective, Frederick Classical's contentions concerning the standard of review applied by the SBE to FCPS's decision are red herrings. It is clear from a review of the SBE's opinion that, Frederick Classical's argument notwithstanding, the SBE applied its independent judgment in concluding that FCPS's PPA calculation was consistent with Maryland law and the SBE did not simply defer to FCPS's determination without undertaking an independent review. I would conclude that the SBE properly

assessed FCPS's decision and correctly determined that FCPS provided full commensurate funding to Frederick Classical.

For the above reasons, I would affirm the judgment of the Court of Special Appeals. Thus, respectfully, I dissent.

Judge Hotten has authorized me to state that she joins in this opinion.